```
 1                IN THE UNITED STATES DISTRICT COURT
                 FOR THE NORTHERN DISTRICT OF TEXAS
 2                       FORT WORTH DIVISION

 3   UNITED STATES OF AMERICA      )  CAUSE NO. 4:09-CR-160-A
                                   (
 4   vs.                           )
                                   (  JANUARY 5, 2010
 5                                 )  FORT WORTH, TEXAS
     DANIEL BERNADINO              (  9:00 A.M.
 6   _____

 7                       VOLUME 1 OF 1

 8   _____

 9                      STATEMENT OF FACTS

10

11           BEFORE THE HONORABLE JOHN H. McBRYDE
                UNITED STATES DISTRICT JUDGE
12                       and a jury
     _____

13
                     A P P E A R A N C E S
14

15

16           FOR THE GOVERNMENT:  UNITED STATES ATTORNEY'S OFFICE
                                  801 CHERRY STREET, SUITE 1700
17                                FORT WORTH, TEXAS  76102
                                  (817) 252-5200
18                                BY:  MR. JOSHUA T. BURGESS
                                       MR. J. MICHAEL WORLEY
19
             FOR THE DEFENDANT:   MR. RODERICK C. WHITE
20                                316 HEMPHILL STREET
                                  FORT WORTH, TEXAS  76104
21                                (817) 850-6661

22      OFFICIAL COURT REPORTER:  EILEEN M. BREWER
                                  424 UNITED STATES COURTHOUSE
23                                FORT WORTH, TEXAS  76102-3637

24                                SHAWN M. McROBERTS, RMR, CRR
                                  1100 COMMERCE, RM. 1654
25                                DALLAS, TEXAS  75242
                                  (214) 753-2349
```

## <u>INDEX</u>

**EXAMINATION**

**Witness Name**                                                                 **Page**

DALLAS SEALS
    Direct By MR. BURGESS............................................  4
    Cross By MR. WHITE.............................................. 21
    Redirect By MR. BURGESS......................................... 27
ROBERT MILLER
    Direct By MR. BURGESS........................................... 28
    Cross By MR. WHITE.............................................. 32
ERNESTO SALINAS
    Direct By MR. BURGESS........................................... 33
    Cross By MR. WHITE.............................................. 37
BRUCE SCHWINGLER
    Direct By MR. BURGESS........................................... 39
DEMPSEY ADDY
    Direct By MR. BURGESS........................................... 44
    Cross By MR. WHITE.............................................. 54
    Redirect By MR. BURGESS......................................... 59
ANDRES RIVAS
    Direct By MR. BURGESS........................................... 61
    Cross By MR. WHITE.............................................. 65
    Direct By MR. BURGESS...........................................105
    Cross By MR. WHITE..............................................106
MICHAEL PONTREMOLE
    Direct By MR. WHITE............................................. 69
    Cross By MR. BURGESS............................................ 72
DANIEL BERNADINO
    Direct By MR. WHITE............................................. 75
    Cross By MR. BURGESS............................................ 85
    Redirect By MR. WHITE........................................... 97
BENJAMIN MARTINEZ
    Direct By MR. WHITE.............................................100
    Cross By MR. BURGESS............................................103

## Government Exhibits

| Government Exhibits | Page |
|---|---|
| No. 5-65 Admitted into Evidence | 14 |
| No. 1 Admitted into Evidence | 16 |
| No. 2 Admitted into Evidence | 16 |
| No. 3 Admitted into Evidence | 17 |
| No. 4 Admitted into Evidence | 17 |
| No. 72-75 Admitted into Evidence | 21 |
| No. 76 Admitted into Evidence | 29 |
| No. 77 Admitted into Evidence | 31 |
| No. 66 Admitted into Evidence | 36 |
| No. 67 Admitted into Evidence | 51 |
| No. 68 Admitted into Evidence | 51 |
| No. 69 Admitted into Evidence | 52 |
| No. 70 Admitted into Evidence | 53 |

## Government Rests

| Government Rests | Page |
|---|---|
| | 68 |

## Government and Defendant Close

| Government and Defendant Close | Page |
|---|---|
| | 107 |

```
 1              THE COURT:  Okay.  You can call your first witness.

 2              MR. BURGESS:  Task Force Officer Dallas Seals.

 3              THE COURT:  For the information of the jury, all of

 4    the witnesses were in the courtroom before the jury panel came

 5    in this morning and they have all been sworn previously.  So

 6    you won't see me administer the oath to any witness, but you

 7    can be assured that they are all testifying under oath.

 8         You may proceed.

 9              MR. BURGESS:  Thank you, Your Honor.

10                         DALLAS SEALS,

11    Testified on direct examination by Mr. Burgess as follows:

12    Q.   Will you please state your name?

13    A.   Dallas Seals.

14    Q.   How are you employed?

15    A.   I am a Fort Worth police officer.  Currently I am

16    assigned to the Bureau of Alcohol, Tobacco & Firearms task

17    force.

18    Q.   How long have you been with the Fort Worth Police

19    Department?

20    A.   Almost 18 years.

21    Q.   And how long with the ATF?

22    A.   Two.

23    Q.   Were you the lead investigator in the investigation of

24    firearms smuggling to Mexico?

25    A.   Yes.
```

```
1    Q.    Was one of the far gets of your investigation Daniel

2    Bernadino?

3    A.    Yes.

4    Q.    Is he present in the courtroom?

5    A.    He is.

6    Q.    Will you please identify him?

7    A.    He is at the Defense table in the center in the light

8    blue shirt and gray jacket.

9              MR. BURGESS:  Your Honor, may the record --

10              THE COURT:  She has identified the Defendant.

11              MR. BURGESS:  Thank you.

12    Q.    (BY MR. BURGESS)  When did your investigation begin?

13    A.    September 2008.

14    Q.    And what was it that you were investigating?

15    A.    Firearms being illegally trafficked to Mexico.

16    Q.    And how did that come to your attention?

17    A.    I received information of a large cash purchase of 20

18    AK-47s at a local FFL here in Fort Worth.

19    Q.    Were you able to determine what the purpose of the

20    organization was?

21    A.    Yes.  To traffic firearms to the La Familia Drug

22    Trafficking Organization.

23    Q.    What is La Familia?

24    A.    La Familia is an organization in Mexico that traffics

25    narcotics into the United States and into Mexico.
```

1    Q.   Were you able to determine specifically where the guns or

2    who the guns were being shipped to?

3    A.   Yes.  The firearms were going to a Bern by the name of

4    Alberto Pulido.

5    Q.   Does he go by any other name?

6    A.   Betico.

7    Q.   Where is he located?

8    A.   In Ecuandureo, Michoacan, Mexico.

9    Q.   And was he connected with the La Familia Drug Trafficking

10   Organization?

11   A.   Yes.

12   Q.   Why not just buy guns and ammunition in Mexico?

13   A.   Firearms and ammunition are highly restricted in Mexico.

14   Many of the type of firearms we are dealing with are illegal.

15   Q.   Do you know an individual by the name of Javier Rosales?

16   A.   Yes.

17   Q.   And who is he?

18   A.   He was a Defendant in this case, a suspect.  He became an

19   organizer of purchasing firearms here in Fort Worth.

20   Q.   And how did he come to the attention of ATF?

21   A.   He took over from another individual and began organizing

22   persons to purchase firearms.

23   Q.   On November the 17th of 2008, was Javier Rosales under

24   surveillance?

25   A.   Yes.

1    Q.    And what happened on that day?

2    A.    He was observed loading firearms into his vehicle, and we

3    continued surveillance on him.

4    Q.    Where did he receive those firearms?

5    A.    From an individual he had hired to purchase them.

6    Q.    Once Mr. Rosales loaded the firearms in his vehicle, what

7    did he do?

8    A.    He drove to a restaurant called Vallarta Restaurant on

9    Seminary Drive here in Fort Worth.

10   Q.    What happened once he got to the restaurant?

11   A.    He was met by two Hispanic males in a Ford pickup truck.

12   At that time he turned over these keys to those individuals

13   and they drove away in the vehicle followed by the Ford pickup

14   truck.

15   Q.    Did you follow Rosales' truck as it was driven away?

16   A.    Yes, we did.

17   Q.    Where did they take his truck?

18   A.    They went to a residence, a location in Cleburne, Texas.

19   Q.    And can you describe that property?

20   A.    That property is 6209 Roberts Lane.  It is a five-acre

21   property with a fence around the outside of the property.  In

22   the middle of the property there is an interior fence

23   containing a residence and also a 60 by 80 foot metal

24   building.  I would call it a shop.

25   Q.    What happened once the truck arrived at the property in

1    Cleburne?

2    A.    The property -- The vehicle entered the property and went

3    around to the shop behind the residence and the firearms were

4    unloaded.

5    Q.    Was Mr. Rosales' truck then returned to him?

6    A.    Yes.

7    Q.    How?

8    A.    The two individuals caravanned back to the restaurant and

9    returned the vehicle to him.

10    Q.    After that incident was the Cleburne compound kept under

11    visual surveillance?

12    A.    Yes.

13    Q.    Was this the only time you saw guns being delivered or

14    taken away from the location?

15    A.    No.

16    Q.    You saw it on other occasions?

17    A.    Yes.

18    Q.    Was there any activity at the ranch that would indicate

19    to you that it was being guarded?

20    A.    Yes.  We saw individuals that actually did put patrols

21    around the perimeter of the property, they had security

22    lights, and a mechanical gate locked at the property.

23    Q.    Turning your attention to December the 16th of 2008, did

24    you receive information that Mr. Rosales had ordered a Colt El

25    Jefe .38 pistol?

```
1    A.    Yes.

2    Q.    Where did he order it?

3    A.    Cheaper Than Dirt.  It is a store here in Fort Worth.

4    Q.    In your investigation, did you determine any significance

5    of an El Jefe pistol?

6    A.    Yes.  The .38 Super El Jefe pistol is a very ornate

7    handgun, an it is often a status symbol for leaders in

8    cartels, and it is often purchased because of the style of the

9    gun.

10   Q.    On December the 19th, 2008, did you observe Mr. Rosales

11   pick up the weapon from Cheaper Than Dirt?

12   A.    Yes.

13   Q.    And where did he go?

14   A.    He drove to 4008 Lisbon Street in Fort Worth.

15   Q.    Whose house is that?

16   A.    Alberto Ortega.

17   Q.    And from the time he delivered the gun, was that house

18   kept under surveillance?

19   A.    Yes, it was.

20   Q.    I turn your attention to later that evening.  Did any

21   vehicles leave the house?

22   A.    Yes.

23   Q.    How many?

24   A.    Two.

25   Q.    Where did they go?
```

```
1    A.    They go just up the street to a Shell gas station at the

2    corner of I-30 and Montgomery.

3    Q.    Anything happen there?

4    A.    There they gassed up and met up with a third vehicle, a

5    red Ford pickup truck.

6    Q.    Who was that red Ford pickup truck registered to?

7    A.    Daniel Bernadino.

8    Q.    The Defendant?

9    A.    The Defendant.

10   Q.    Was there anything about the vehicle -- about the way the

11   vehicles were loaded that raised your suspicions?

12   A.    Yes.  The vehicles, the truck and the light Oldsmobile

13   were loaded up, you could visually see into them, with all

14   kinds of materials, bags, luggage, buckets.  You could see it

15   above the windows, completely packed down.  The Chevy van, you

16   couldn't see inside of it, but from the suspension on the

17   vehicle you could tell that it was riding very low and

18   appeared to be loaded with something.

19   Q.    Where did the vehicles begin driving?

20   A.    They drove east on 30 and then southbound on 35-W.

21   Q.    Did they drive together?

22   A.    Yes, all three vehicles.

23   Q.    Anything unique about the way they drove?

24   A.    They drove caravan style in close proximity to one

25   another at all times.
```

1   Q.   Based upon your training and experience, what did that

2   indicate to you?

3   A.   In law enforcement we have seen that as a security

4   measure sometimes for -- So they can keep together,

5   communicate, not allow other vehicles to get in between them

6   and possibly push them off the road, any kind of activity like

7   that.

8   Q.   Which vehicle had the lead?

9   A.   The Ford pickup truck registered to Daniel Bernadino.

10  Q.   The entire time?

11  A.   Yes.

12  Q.   What other vehicles were in the caravan?

13  A.   The '99 white Chevy van was in the center position, and a

14  white Oldsmobile had the rear.

15  Q.   Did they make any stops on their trip?

16  A.   Yes.  They stopped at a gas station two times during the

17  trip.

18  Q.   Did they stop separately or together?

19  A.   All together.

20  Q.   When they would stop, was there anything unusual about

21  the stops?

22  A.   Yes.  Two individuals, males, would stay with the

23  vehicles while the others would go inside.  And then when the

24  others would come back out, then they would go inside, making

25  sure that someone was with the vehicles at all times.

1  Q.   As the three vehicles continued going south, what did you

2  conclude?

3  A.   We made the conclusion that they were headed to Mexico.

4  Q.   And what did you do?

5  A.   We contacted DPS for further assistance on our

6  surveillance since we were going to far.

7  Q.   What is the significance of the 25-mile marker as it

8  relates to the U.S./Mexican border?

9  A.   That is where the Border Patrol check stations begin.

10 Q.   Were the vehicles in the caravan stopped once they were

11 within that 25-mile line at the border?

12 A.   They were.

13 Q.   Was the Defendant in one of the vehicles?

14 A.   Yes, he was.

15 Q.   Which vehicle?

16 A.   He was the driver of the red Ford pickup truck registered

17 to him.

18 Q.   To your knowledge, did the drivers of the vehicles

19 consent to their vehicles being searched?

20 A.   Yes.

21 Q.   And were they searched on the highway?

22 A.   No.  The drivers all consented to go back to the Border

23 Patrol station.

24 Q.   And were they searched there?

25 A.   Yes.

1    Q.    Was anything unusual found?

2    A.    Yes.  An X-ray of the '99 Chevy van presented an anomaly

3    inside the van that the operator felt an additional search was

4    warranted.

5    Q.    Who was the driver of that van?

6    A.    Alberto Ortega.

7    Q.    Did he have anyone with him?

8    A.    Yes.  His wife and two sons.

9    Q.    Did you help in the search of the white van?

10   A.    Yes.

11   Q.    And what did you find?

12   A.    Firearms; 33 firearms were found inside the vehicle.

13   Q.    Anything else?

14   A.    Approximately 9,000 rounds of ammunition.

15   Q.    How were the guns and ammunition hidden?

16   A.    They were inside the walls between the lining of the

17   walls and the exterior of the van and the ceiling, concealed

18   inside those compartments.

19   Q.    Had modifications been made to the van to allow that to

20   happen?

21   A.    Yes.  There was plywood and false compartments inside the

22   walls of the van.

23   Q.    Did you have to take the van apart to find them?

24   A.    Yes.

25   Q.    Please take a look -- There should be an exhibit book in

1    front of you.  Will you please take a look at Government

2    Exhibit No. 5 through 65.  I believe you have looked at those

3    earlier today.  Is that correct?

4    A.    Yes, sir.

5    Q.    And what are those?

6    A.    These are photos that were taken during the search in

7    Laredo, Texas.

8    Q.    Do they fairly and accurately reflect the way the

9    firearms and ammunition were found at the border?

10   A.    Yes, they do.

11             MR. BURGESS:  Your Honor, at this time I move to

12   admit Government Exhibit No. 5 through 65.

13             THE COURT:  No. 5 through 65?

14             MR. BURGESS:  Yes, Your Honor.

15             THE COURT:  They are received.

16             MR. BURGESS:  Thank you.

17   Q.    (BY MR. BURGESS)  Now, some of the guns, looking at the

18   photos, are wrapped in aluminum foil.  Is that correct?

19   A.    Yes, they were.

20   Q.    Why is that?

21   A.    Some smugglers have a belief that they can beat the X-ray

22   system if things are wrapped in aluminum foil.

23   Q.    Was there anything wrapped on the outside of the

24   wrappings?

25   A.    Yes.  A lot of the packages have masking tape on them

```
 1   with labels with names on them.

 2   Q.   Was there anything significant to your investigation

 3   about some of the names on the labels?

 4   A.   Yes.  A lot of the packages had labels on them with the

 5   name Pulido, and also PUL.

 6   Q.   You indicated 33 guns were ultimately pulled out.  What

 7   kinds of guns were those?

 8   A.   Handguns, rifles, and shotguns.

 9   Q.   Will you please take a look at Government Exhibit No. 1

10   through 4?  I believe they are in a box by your feet.

11   A.   Yes.

12   Q.   If you will please take a look at Government Exhibit

13   No. 1 and identify that for me.

14   A.   Government's Exhibit No. 1 is a Smith and Wesson

15   revolver.  It is a Model 19-4 .357.

16   Q.   Was that gun seized from the van?

17   A.   Yes, it was.

18   Q.   Does it have any sort of labeling on it?

19   A.   It does.  It appears to have the name Samuel written on

20   it.

21   Q.   Okay.  You can set that down and please take a look at

22   Government Exhibit No. 2.  And actually for the record --

23            THE COURT:  Let me suggest, if you are going

24   to -- If those are going to be held up where everybody can see

25   them, they have to be in evidence.
```

1          MR. BURGESS:  Yes, Your Honor.  I will ask that she

2    keep them below the desk.

3          THE COURT:  Let's go back and start with No. 1.  Are

4    you offering that?

5          MR. BURGESS:  I would offer to admit Exhibit No. 1

6    at this time, Your Honor.

7          THE COURT:  Okay.  It is received in evidence.

8       Now, before we do anything further with No. 2, have you

9    sufficiently identified it, do you think?

10         MR. BURGESS:  I don't believe she has, no, Your

11   Honor.

12         THE COURT:  Okay.  Well, don't display it.  Simply

13   say what it is before it is displayed.

14         THE WITNESS:  Okay.

15         MR. BURGESS:

16   Q.   What is Exhibit No. 2?

17   A.   It is a Colt .38 Super El Jefe handgun.

18   Q.   And is that a weapon that was seized from the border?

19   A.   Yes, it was.

20         MR. BURGESS:  Your Honor, I move to admit Government

21   Exhibit No. 2.

22         THE COURT:  It is received.

23       When you say "From the border", what was it seized from?

24         THE WITNESS:  It was taken from the '99 Chevy van at

25   the search in Laredo, Texas.

1              THE COURT:  One of the 33 weapons you have mentioned

2     earlier?

3              THE WITNESS:  Yes, sir.

4              THE COURT:  Okay.  It is received, Exhibit No. 2.

5              MR. BURGESS:  Thank you, Your Honor.

6     Q.   (BY MR. BURGESS)  Please take a look at Government

7     Exhibit No. 3.

8     A.   Yes.

9     Q.   What is that?

10    A.   This weapon is a WASR-10, an AK-47 type weapon.

11    Q.   Where was that gun retrieved from?

12    A.   It was seized from the '99 Chevy van in Laredo, Texas.

13             MR. BURGESS:  Your Honor, I move to admit Government

14    Exhibit No. 3.

15             THE COURT:  It is received.

16    Q.   (BY MR. BURGESS)  And please take a look -- You can go

17    ahead and set that up top, if there is room.  Please take a

18    look at Government Exhibit No. 4?

19    A.   No. 4 is a Smith and Wesson revolver, Model 19-2 .357

20    caliber revolver.

21    Q.   Was that also seized from the van of Mr. Ortega?

22    A.   Yes, it was.

23             MR. BURGESS:  Your Honor, I move to admit Government

24    Exhibit No. 4.

25             THE COURT:  It is received.

```
 1   Q.   (BY MR. BURGESS)  How were those weapons in particular

 2   wrapped?

 3   A.   They were all wrapped in foil.

 4         THE COURT:  Let me ask a question.  Government's

 5   exhibit, I think it was No. 3, the long gun, that has

 6   something on the end of it.  What is that?

 7         THE WITNESS:  A high capacity magazine that was

 8   attached to the gun.

 9         THE COURT:  Was that with the gun when you found the

10   gun?

11         THE WITNESS:  Yes, sir.

12         THE COURT:  Okay.

13         MR. BURGESS:  Thank you, Your Honor.

14   Q.   (BY MR. BURGESS)  What is the significance of Government

15   Exhibit No. 2, the Colt El Jefe pistol as relates to this

16   investigation?

17   A.   This firearm was the handgun that Javier Rosales had

18   purchased on the previous day.

19   Q.   And was it labeled?

20   A.   Yes.

21   Q.   What did the label say?

22   A.   It has PUL. written in masking tape on the side of the

23   weapon.

24   Q.   And where was this weapon found?

25   A.   It was inside the back left speaker compartment, when you
```

1    open the van the back left wall inside -- We had taken the

2    speaker cover off, and it was one of the first things that we

3    had found.

4    Q.    Does that weapon have a serial number on it?

5    A.    It does.

6    Q.    Will you please read the serial number?

7    A.    It is 38SS04054.

8    Q.    During this investigation did you obtain a court

9    authorized wiretap to Javier Rosales' phone?

10   A.    Yes.

11   Q.    Were you able to confirm that you were listening to Mr.

12   Rosales' phone?

13   A.    Yes.

14   Q.    Have you had a chance to review the transcript listed as

15   Government Exhibit No. 72 through 75?

16   A.    I have.

17   Q.    And based on your review of those phone calls, were you

18   able to determine whether or not there was a profit motive for

19   the members of this conspiracy?

20   A.    Yes.

21   Q.    And was there?

22   A.    Yes, there was.

23   Q.    Were they selling the guns for the same price or for a

24   mark-up?

25   A.    A mark-up so that they could make a profit.

1  Q.   In Exhibit No. 73 there is actually a conversation about

2  how much money they made per gun.  Correct?

3  A.   Yes.

4  Q.   And in Exhibit No. 74 they complain about not profiting

5  on some pill containers.  Correct?

6  A.   Yes.

7  Q.   What is a pill container?

8  A.   A pill container is a gun magazine that holds bullets.

9          MR. BURGESS:  Your Honor, at this time I move to

10  admit Government's Exhibit No. 72 through 75.

11          MR. WHITE:  Your Honor, we would object to No. 73

12  through 75 as they are hearsay, and they violate the

13  confrontation clause of the United States Constitution.

14          THE COURT REPORTER:  I am sorry.  I can't hear you.

15          MR. WHITE:  Hearsay and violation of the

16  confrontation clause.

17          THE COURT:  Okay.  I will overrule the objections.

18      Which ones are you offering?

19          MR. BURGESS:  No. 72 through 75, Your Honor.

20          THE COURT:  As I understand it, there is no question

21  as to the authenticity of them.  Is that correct?

22          MR. BURGESS:  Not from the United States; no, Your

23  Honor.  I don't believe the Defense has raised any issue on

24  the authenticity either.

25          THE COURT:  Okay.  Those are received.

1              MR. BURGESS:  Thank you.

2              THE COURT:  Tell me again what numbers you are

3    talking about.

4              MR. BURGESS:  No. 72 through 75, Your Honor.

5              THE COURT:  Okay.  They are received.

6    Q.  (BY MR. BURGESS)  Did you personally determine if the

7    Defendant or any of the co-conspirators in this case are

8    licensed as federal firearms licensees?

9    A.  Yes, I did.

10   Q.  And did they have such a license?

11   A.  No.  None of them are federal licensees.

12   Q.  Did any of them have such a license during the time of

13   this conspiracy?

14   A.  No, they did not.

15   Q.  Thank you.

16             MR. BURGESS:  I have no further questions, Your

17   Honor.  I will pass the witness.

18             THE COURT:  Do you have any questions of this

19   witness?

20             MR. WHITE:  Yes, Your Honor.

21                        CROSS EXAMINATION

22   By Mr. White:

23   Q.  You weren't able to ascertain whether or not anybody in

24   this conspiracy knew they had to have a license to take guns

25   out of the United States, were you?

```
 1   A.    No.

 2   Q.    Mr. Bernadino became a target of your investigation as

 3   early as September of 2008?  How so?

 4   A.    Mr. Bernadino did not.  Others at that date did.  He

 5   became a target later.

 6   Q.    When?

 7   A.    December 20th of 2008.

 8   Q.    Really the 19th is the night before they left, so --

 9   A.    When he was identified.  When we knew who we were dealing

10   with.

11   Q.    And when did you begin surveillance on I believe it is

12   4008 Lisbon?

13   A.    Approximately 11:00 in the morning.

14   Q.    On December the 19th?

15   A.    Yes.

16   Q.    And when was the first time Mr. Bernadino appears at 4008

17   Lisbon?

18   A.    I don't know the approximate time.  I didn't have the eye

19   on the house.  I just know that his vehicle was there.  There

20   were other agents and officers that were there at the time.

21   Q.    Do you know who?

22   A.    I believe Task Force Officer Addy was there.

23   Q.    Do you know how long Mr. Bernadino stayed at 4008 Lisbon?

24   A.    No.

25   Q.    Do you know what he did at 4008 Lisbon?
```

1  A.    No.

2  Q.    You said there was a -- In September of 2008 there was a

3  large cash purchase of 20 AK-47s?

4  A.    Yes.

5  Q.    What involvement did Mr. Bernadino have in that purchase?

6  A.    None that I know of.

7  Q.    Alberto Pulido, the guns were going to him in Mexico?

8  A.    He was the driver of the van.  He was the one taking them

9  to Mexico.

10  Q.    And you said on September the 11th you began surveillance

11  on Javier Rosales?

12  A.    September 11th?

13  Q.    Where he takes the guns to Cleburne?

14  A.    I am not sure about the date, but yes I did do a

15  surveillance when he took them to Cleburne.

16  Q.    And what was Mr. Bernadino's involvement in taking those

17  guns to Cleburne?

18  A.    None that I know of.

19  Q.    Did you ever see Mr. Bernadino out at that ranch or

20  compound in Cleburne?

21  A.    No.

22  Q.    Ever have -- In the course of your investigation, have

23  you run across anything that would lead you to believe that he

24  has ever been out there?

25  A.    No.

1    Q.   On December the 16th, Mr. Rosales purchases the El Jefe

2    handgun?

3    A.   I think on the 16th he ordered it.  It was a special

4    order.

5    Q.   And when in fact did he pick it up?

6    A.   The 19th of December.

7    Q.   On the 16th and the 19th with regard to your

8    investigation concerning that El Jefe, what was

9    Mr. Bernadino's involvement?

10   A.   None that I know of.

11   Q.   Now, you talked about on the 19th they leave in the

12   caravan from Fort Worth headed towards Laredo.  You said in

13   your involvement -- In your experience sometimes smugglers

14   will use a caravan for security measures?

15   A.   Yes.

16   Q.   Are there any other reasons people might use a caravan in

17   traveling like that?

18   A.   Certainly there could be other reasons.

19   Q.   Now, when you get down to the border and you unload the

20   white van and you look into it, can you see the guns from

21   looking into it?

22   A.   No.

23   Q.   Do you have any reason to believe Mr. Bernadino saw the

24   guns prior to getting down near the border?

25   A.   At the time that we were doing the search, no.

1        THE COURT:  Well, I think he wants a full answer to

2  the question.  He wants to know if you have any reason to

3  think that he had anything to do -- had any knowledge of the

4  guns.

5        THE WITNESS:  Now I do, yes.

6  Q.  (BY MR. WHITE)  Do you believe he was there when the guns

7  were loaded into that white van?

8        THE COURT:  Let her answer the question.  Answer his

9  question.

10        THE WITNESS:  Knowledge that there were guns in the

11  van?  Is that the question?

12  Q.  (BY MR. WHITE)  Yes.

13  A.  I believe now that he had knowledge that there were guns

14  in the van.

15  Q.  And how did he acquire that knowledge?

16  A.  From Alberto Ortega is my belief.

17  Q.  But you don't believe he was there loading --

18  A.  I don't know.

19  Q.  Do you have any evidence in the course of your

20  investigation to lead you to the conclusion that he was

21  there --

22        THE COURT:  I think she has answered that question.

23  Let's don't keep asking the same questions over again.

24  Q.  (BY MR. WHITE)  When they leave from Lisbon on the night

25  they start driving, they stop at a Shell gas station.

26

1    A.    Yes.

2    Q.    And that is where they join Mr. Bernadino's red pickup

3    truck?

4    A.    Yes.

5    Q.    Were any guns found in that red pickup truck?

6    A.    No.

7    Q.    Who was driving Mr. Bernadino's truck from the Shell gas

8    station?

9    A.    Daniel Bernadino.

10   Q.    Was driving from the Shell gas station?

11   A.    Yes.

12   Q.    Okay.  Do you know who all was in the car with him?

13   A.    No, not off the top of my head.  I know that there were

14   several passengers in the vehicle.

15   Q.    The guns and the ammunition, you said some of them had

16   labels on them, and you took those labels to mean that was who

17   they were going to in Mexico.

18   A.    It can mean several things.  They would all be

19   assumptions.  That would be one of them, or it was who they

20   were from.  I don't know what they mean.

21   Q.    So either where they were going or --

22          THE COURT:  Let's don't ask her the same question.

23   She just answered that question.

24   Q.    (BY MR. WHITE)  Did any of the labels on any of the guns

25   or ammunition have any references to Daniel Bernadino either

 1   to or from?

 2   A.   No.

 3   Q.   In Government's No. 72 through 75, is there any

 4   mention -- I am sorry.  Is Daniel Bernadino speaking in any of

 5   these transcripts?

 6   A.   No.

 7   Q.   Is there any mention of Daniel Bernadino?

 8   A.   No.

 9           MR. WHITE:  Pass the witness.

10           THE COURT:  Do you have any further questions?

11           MR. BURGESS:  Yes, Your Honor.  Thank you.

12                    REDIRECT EXAMINATION

13   By Mr. Burgess:

14   Q.   Were any of the people charged in this conspiracy seen at

15   the Cleburne location at any time?

16   A.   I am sorry.  Ask me again.

17   Q.   Were any of the people charged in the indictment seen at

18   the Cleburne location at any time?

19   A.   There was one person.

20   Q.   One out of eight?

21   A.   Eight.

22   Q.   Thank you.

23           MR. BURGESS:  No further questions, Your Honor.

24           THE COURT:  Okay.  You can step down.

25           Call your next witness.

1          MR. BURGESS:  Robert Miller.

2          THE COURT:  Okay.  You may proceed.

3          MR. BURGESS:  Thank you.

4                    ROBERT MILLER,

5    Testified on direct examination by Mr. Burgess as follows:

6    Q.   Will you please state your name?

7    A.   Robert Miller.

8    Q.   And how are you employed?

9    A.   I am floor supervisor at Cheaper Than Dirt Outdoor

10   Adventures.

11   Q.   And what is the business of Cheaper Than Dirt?

12   A.   It is a retail gun store.

13   Q.   Were you working at Cheaper Than Dirt on December the

14   16th, 2008?

15   A.   Yes.

16   Q.   Did you sell any weapons to a person named Javier Rosales

17   on that date?

18   A.   Yes.

19   Q.   What kind of gun was it?

20   A.   It was an embellished Colt 19-11, a .38 Super.

21   Q.   When you say embellished, what does that mean?

22   A.   Engraving, gold, things like that.

23   Q.   Did you have that gun in stock?

24   A.   No.  It was a special order.

25   Q.   And how much did that weapon cost?

1    A.    1899.

2    Q.    $1,899?

3    A.    Yes.

4    Q.    And how did Mr. Rosales pay?

5    A.    Cash.

6    Q.    Let's take a look -- There should be an exhibit book in

7    front of you.

8    A.    Uh-huh.

9    Q.    If you could take a look at Government Exhibit No. 76.

10    A.    Yes.

11    Q.    Do you recognize that?

12    A.    Yes.

13    Q.    What is it?

14    A.    Exhibit No. 76 is a special order form for the weapon.

15    Q.    And does it also include the receipt for the purchase?

16    A.    Yes.

17            MR. BURGESS:  Your Honor, at this time I move to

18    admit Government Exhibit No. 76.

19            THE COURT:  It is received.

20            MR. WHITE:  We would object that it is hearsay and

21    violative of the confrontation clause.

22            THE COURT:  I will overrule the objection.

23    Q.    (BY MR. BURGESS)  Turning your attention to December the

24    19th of 2008, did he return to pick up the weapon?

25    A.    Yes.

```
 1    Q.   Is there a form that a person has to fill out in order to

 2    purchase a firearm?

 3    A.   It is an ATF federal form 4473.  It is for

 4    over-the-counter sale or transfer of firearms.

 5    Q.   And is that kept in the normal course of business at your

 6    store?

 7    A.   Yes.

 8    Q.   And is that because your business is a federal firearms

 9    licensee?

10    A.   Correct.

11    Q.   Did Javier Rosales fill out such a form?

12    A.   Yes.

13    Q.   Please take a look at Government Exhibit No. 77.

14    A.   Yes.

15    Q.   Do you recognize it?

16    A.   That is the Form 4473.

17    Q.   Filled out by whom?

18    A.   Javier Rosales.

19    Q.   Has that form been kept in the custody and control of

20    your business since that time?

21    A.   Yes.

22         MR. BURGESS:  Your Honor, at this time I move to

23    admit Government Exhibit No. 77.

24         MR. WHITE:  The same objections, Your Honor; hearsay

25    and violative of the confrontation clause.
```

```
 1              THE COURT:  It is received.

 2         Do you have the original, or is that a copy?

 3              MR. BURGESS:  The original is in the book, Your

 4    Honor.

 5              THE COURT:  I am asking him.

 6              MR. BURGESS:  I am sorry.

 7              THE WITNESS:  I brought the original with me today,

 8    yes.

 9              THE COURT:  The one you have identified is the

10    original?

11              THE WITNESS:  Yes.  It is the original.

12              THE COURT:  Okay.  You don't need to pull it out.  I

13    just want to be sure it is the original.

14              THE WITNESS:  Yes, sir.

15              THE COURT:  Okay.  And what gun does that show was

16    purchased?

17              THE WITNESS:  The Colt .38 Super 19-11.

18              THE COURT:  There is some guns up there.  Is it one

19    of those?

20              THE WITNESS:  Yes.  It is that one right there.

21              THE COURT:  Does it have an exhibit number on it,

22    the one when you say "right there"?  Look on the handle, the

23    grip.

24              THE WITNESS:  No. 2.

25              THE COURT:  Exhibit No. 2?
```

1          THE WITNESS:  Yes.

2          THE COURT:  Okay.

3     Q.   (BY MR. BURGESS)  And sir, referring to the form that was

4     filled out by Javier Rosales, the serial number for the pistol

5     he purchased was 38SS04054.  Is that correct?

6     A.   Yes, sir.

7     Q.   Thank you.

8          MR. BURGESS:  I have no further questions, Your

9     Honor.

10         THE COURT:  Do you have any questions of this

11    witness?

12         MR. WHITE:  Yes, Your Honor.

13                        CROSS EXAMINATION

14    By Mr. White:

15    Q.   When Javier Rosales purchased this El Jefe pistol and

16    filled out these forms, where was Mr. Daniel Bernadino?

17    A.   I have no idea.

18    Q.   What involvement did Mr. Bernadino have in filling out

19    these forms or purchasing this pistol?

20    A.   Mr. Javier Rosales filled out the form.  I have no

21    idea -- No one else had anything involved with it other than

22    my store staff.

23         MR. WHITE:  No further questions.

24         THE COURT:  Do you have anything else you want to

25    ask him?

```
 1            MR. BURGESS:  No, Your Honor.  Thank you.

 2            THE COURT:  You can step down.  Thank you.

 3            MR. BURGESS:  Your Honor, may this witness be

 4   excused?

 5            THE COURT:  Yes.  You are excused as a witness.

 6            MR. BURGESS:  Thank you.

 7            THE COURT:  Call your next witness.

 8            MR. BURGESS:  Sergeant Ernesto Salinas.

 9            THE COURT:  Okay.  You may proceed.

10            MR. BURGESS:  Thank you, Your Honor.

11                         ERNESTO SALINAS,

12   Testified on direct examination by Mr. Burgess as follows:

13   Q.   Will you please state your name?

14   A.   Ernesto Salinas.

15   Q.   Will you please spell your last name?

16   A.   S-A-L-I-N-A-S.

17   Q.   And how are you employed?

18   A.   With the Texas Department of Public Safety.

19   Q.   For how long?

20   A.   Thirteen years.

21   Q.   Where are you assigned?

22   A.   I am assigned to the Criminal Investigation Division.

23   Q.   And were you assigned to that same division on December

24   the 20th of 2008?

25   A.   Yes, sir.
```

```
 1    Q.    Were you on duty that day?

 2    A.    Yes, sir.

 3    Q.    Were you involved in the stop of several vehicles just

 4    north of the Mexican border?

 5    A.    Yes, sir.

 6    Q.    As a result of that stop, did you interview a person by

 7    the name of Daniel Bernadino?

 8    A.    Yes.

 9    Q.    Is he present in the courtroom?

10    A.    Yes, sir.

11    Q.    Will you please identify him?

12    A.    Wearing that gray jacket and blue shirt.

13              THE COURT:  He has identified the Defendant.

14              MR. BURGESS:  Thank you, Your Honor.

15    Q.    (BY MR. BURGESS)  Did you conduct the interview in

16    English or in Spanish?

17    A.    In Spanish.

18    Q.    Why?

19    A.    The Defendant stated that he didn't understand English.

20    Q.    Who is Alberto Ortega?

21    A.    That was the person that was driving the van.

22    Q.    Which van?

23    A.    The van that the weapons were found in.

24    Q.    I am sorry.  I didn't hear you?

25    A.    The van that the weapons were found in.
```

1    Q.    Thank you.

2          Did the Defendant say if he knew Alberto Ortega?

3    A.    Yes, sir.

4    Q.    How did he know him?

5    A.    He said they were neighbors.

6    Q.    Did he say how long he had known him?

7    A.    For about five years.

8    Q.    Did he say whether they lived near one another?

9    A.    Yes.

10   Q.    Where?

11   A.    Here in Dallas, Fort Worth.

12   Q.    During the interview, was a receipt taken from the

13   Defendant's wallet?

14   A.    Yes, sir.

15   Q.    Where was that receipt taken from?

16   A.    From his wallet.

17   Q.    I just said that.  Where was it from?

18   A.    Cabela's.

19   Q.    Thank you.

20         Please take a look at Government Exhibit No. 66 in the

21   notebook in front of you.  Did you find it?

22   A.    Yes, sir.

23   Q.    What is Government Exhibit No. 66?

24   A.    It is a receipt for ammo from the Cabela store here in

25   Fort Worth.

```
 1    Q.   Is that the same receipt that you took from the Defendant
 2    Mr. Bernadino?
 3    A.   Yes, sir.
 4         MR. BURGESS:  Your Honor, at this time I move to
 5    admit Government Exhibit No. 66.
 6         THE COURT:  It is received.
 7    Q.   (BY MR. BURGESS)  Once you showed the Defendant that
 8    Exhibit No. 66, the receipt to Cabela's, how did he react?
 9    A.   He put his head down like this, his shoulders went down,
10    started sweating a little bit, and I could see his arterial
11    vein jiggling.
12    Q.   It had not been doing that prior to the receipt being
13    shown?
14    A.   No, sir.
15    Q.   The receipt Government Exhibit No. 66 shows that the
16    Defendant purchased seven boxes of .45 automatic 230 grain
17    full metal jacket ammunition.  Correct?
18    A.   Correct.
19    Q.   And that he bought five boxes of 9 millimeter 115 grain
20    ammunition?
21    A.   Correct.
22    Q.   For a total cost of $141.67?
23    A.   Yes, sir.
24    Q.   Did the Defendant say if he bought that ammunition?
25    A.   Yes, sir.
```

1    Q.    When did he buy the ammunition?

2    A.    What he told me?  Prior to making the trip over there to

3    Mexico.

4    Q.    What did the Defendant tell you about the ammunition as

5    to why he bought it?

6    A.    He had bought it to give it to Ortega.

7    Q.    Had he been asked to do so?

8    A.    Yes, sir.

9    Q.    What if anything did the Defendant say about the guns

10   that were found in the van and their travel to Mexico?

11   A.    That they were going to be taken to Mexico and sold over

12   there, and then Ortega was going to give him the money that he

13   had paid for.

14   Q.    That he had paid for the ammunition?

15   A.    Correct.  Once he sold the ammo in Mexico.

16   Q.    Thank you.

17            MR. BURGESS:  I have no further questions, Your

18   Honor.  I will pass the witness.

19            THE COURT:  Do you have any questions of this

20   witness?

21            MR. WHITE:  Yes, Your Honor.

22                      CROSS EXAMINATION

23   By Mr. White:

24   Q.    Mr. Bernadino was going to simply be paid back for the

25   ammunition that he purchased.  Correct?

1    A.    That is what he told me.

2    Q.    He was not going to make a profit.  Correct?

3    A.    Correct.

4    Q.    With regard to the question that was asked of

5    Mr. Bernadino concerning when he learned of the guns in the

6    white van, what was the question that was posed?

7    A.    I will have to look at my notes.

8    Q.    I am sorry?

9    A.    I will have to look at the report.

10   Q.    Do you have that handy?

11   A.    Yes, sir.  May I look at it?

12   Q.    Please.

13   A.    Can you repeat the question, sir?

14   Q.    What was the question posed regarding when he learned of

15   the existence of the guns in the white van?

16   A.    I don't recall the exact question that was asked.

17   Q.    Did you ascertain anything about how he learned of the

18   guns in the white van?

19   A.    No, sir.

20   Q.    Were you there when the -- before the --

21            MR. WHITE:  Pass the witness.

22            THE COURT:  Do you have any other questions?

23            MR. BURGESS:  No, Your Honor.  Thank you.

24            THE COURT:  Can he be excused as a witness?

25            MR. BURGESS:  No, Your Honor.

1          THE COURT:  Okay.  You can step down, but you are

2    not excused.

3          THE WITNESS:  Yes, sir.

4          THE COURT:  Call your next witness.

5          MR. BURGESS:  Chuck Schwingler, Your Honor.

6          THE COURT:  Okay.  You may proceed.

7          MR. BURGESS:  Thank you, Your Honor.

8                    BRUCE SCHWINGLER,

9    Testified on direct examination by Mr. Burgess as follows:

10   Q.    Could you please state your name?

11   A.    Bruce Charles Schwingler.

12   Q.    And how are you employed?

13   A.    By the Department of State, Washington, D.C.

14   Q.    For how long?

15   A.    Ten years.

16   Q.    Prior to that what did you do?

17   A.    I was still -- I just retired from the active Army

18   Reserves for three years.

19   Q.    What is it that you currently do for the State

20   Department?

21   A.    I am a division chief for the Small Arms and Light

22   Weapons Division and Defense Trade Controls.

23   Q.    Does the State Department restrict the exportation of

24   firearms?

25   A.    Yes.

```
1   Q.   How do they do that?

2   A.   By a licensing process.

3   Q.   What is the directorate of Defense Trade Controls?

4   A.   It is the regulator or the implementor of International

5   Traffic and Arms Regulations.

6   Q.   And what is the International Traffic and Firearms

7   Regulations?

8   A.   That is what they call the United States munitions list.

9   Congress has delegated or authorized the President of the

10   United States to regulate the export of defense articles, and

11   that is done via the Arms Export Control Act, and the

12   implementing instructions or regulations for the Arms Export

13   Control Act is the International Traffic and Arms Regulations.

14   Q.   In a nutshell, is it illegal to export certain weapons

15   from the United States without a license?

16   A.   A license is required for the export of all firearms from

17   the United States regardless of caliber.

18   Q.   Based upon your position with the State Department, do

19   you have personal knowledge as to what weapons and ammunition

20   may not be exported without a license?

21   A.   As the division chief for small arms and light weapons,

22   yes.

23   Q.   Is a Colt El Jefe .38 caliber handgun prohibited to be

24   exported without a license?

25   A.   Yes, it is prohibited.
```

```
 1   Q.    How about an --

 2              THE COURT:  Let me interrupt.  I thought you said

 3   all firearms were prohibited without a license.

 4              THE WITNESS:  All firearms require a license for

 5   export.

 6              THE COURT:  Why are you asking about individual --

 7              MR. BURGESS:  I believe because some licensing comes

 8   from Commerce as opposed to State, Your Honor, and he has

 9   knowledge as to which ones would fall under the State

10   Department.

11              THE COURT:  Oh, okay.  Go ahead.

12   Q.   (BY MR. BURGESS)  I think you just testified the PTR-91

13   is prohibited by the Department of State to be exported?

14   A.    Yes, it is.

15   Q.    And how about the Romanian Arms WASR-10?

16   A.    Yes, it is also.

17   Q.    And how about Smith and Wesson .357 handgun?

18   A.    Also requires a license.

19              THE COURT:  From who?

20              THE WITNESS:  The State Department, sir.

21              MR. BURGESS:  Thank you.

22   Q.   (BY MR. BURGESS)  Now, there was also ammunition that you

23   were asked to review.  Correct?

24   A.    Yes.

25   Q.    Can ammunition be included on the munitions list as
```

1    prohibited?

2    A.    Yes, it is.

3    Q.    And was the Sellier & Bellot 9 millimeter and Sellier &

4    Bellot .45 caliber ammunition both prohibited?

5    A.    They are both prohibited.

6    Q.    Is there a State Department database that tracks who has

7    an export license?

8    A.    Yes, there is.  It is a massive database.

9          THE COURT:  Let me clarify something.  When you say

10   they were both prohibited, you mean by State Department?

11         THE WITNESS:  They are both prohibited for export by

12   State Department without a license.

13         THE COURT:  Okay.

14   Q.    (BY MR. BURGESS)  What all does the database archive?

15   A.    It archives anyone who has requested, has been authorized

16   to import -- I am sorry.  Temporarily import, temporarily

17   export, or permanently export defense articles.

18   Q.    Are those archives kept as part of the normal course of

19   business for the State Department?

20   A.    Yes, they are.

21   Q.    Is that part of the State Department's regulatory

22   function?

23   A.    It is.

24   Q.    Were you able to determine if Daniel Bernadino has a

25   license to export firearms?

```
 1   A.    That name did not come up in the database.

 2   Q.    How did you do a check?

 3   A.    We entered the name in the database with the parameters

 4   of his first name and last name, and came up with no hits.

 5   Q.    Let me list several other names for you, and please tell

 6   me if any of these persons also have export licenses.  Eduardo

 7   Flores?

 8   A.    No record.

 9   Q.    Isidro Lozano?

10   A.    No record.

11   Q.    Jesus Ortega?

12   A.    No record.

13   Q.    Alberto Pulido?

14   A.    No record.

15   Q.    Gustavo Pulido?

16   A.    No record.

17   Q.    Javier Rosales?

18   A.    No record.

19   Q.    Thank you.

20         MR. BURGESS:  I have no further questions, Your

21   Honor.  I will pass the witness.

22         THE COURT:  Do you have any questions of this

23   witness?

24         MR. WHITE:  No questions, Your Honor.

25         THE COURT:  Can he be excused as a witness?
```

```
 1              MR. BURGESS:  He may, Your Honor.

 2              THE COURT:  You are excused.  Thank you.

 3         Call your next witness.

 4              MR. BURGESS:  Dempsey Addy, Your Honor.

 5              THE COURT:  Okay.  You may proceed.

 6              MR. BURGESS:  Thank you, Your Honor.

 7                        DEMPSEY ADDY,

 8    Testified on direct examination by Mr. Burgess as follows:

 9    Q.   Will you please state your name?

10    A.   Dempsey Addy.

11    Q.   How are you employed?

12    A.   As a police officer with the City of Fort Worth.

13    Q.   And where are you currently assigned?

14    A.   As a task force officer for the Bureau of Alcohol,

15    Tobacco, Firearms & Explosives.

16    Q.   Were you an investigator in the case of guns being

17    smuggled to Mexico?

18    A.   Yes, sir.

19    Q.   Do you know a person by the name of Daniel Bernadino?

20    A.   Yes, sir, I do.

21    Q.   Is he present in the courtroom?

22    A.   Yes, sir, he is.

23    Q.   Can you please identify him?

24    A.   He is the gentleman in the gray tweed jacket at Defense

25    table sitting by Mr. White.
```

1          THE COURT:  He has identified the Defendant.

2          MR. BURGESS:  Thank you, Your Honor.

3    Q.   (BY MR. BURGESS)  On December the 19th, 2008, did you

4    conduct surveillance at 4008 Lisbon in Fort Worth, Texas?

5    A.   Yes, sir, I did.

6    Q.   When did that surveillance begin?

7    A.   At approximately 11:00 a.m. in the morning on December

8    19th.

9    Q.   Can you describe the carport as it relates to the house?

10   A.   Yes, sir.  The driveway -- There is a driveway leading to

11   a carport on the eastern side of the house.  It is a slight

12   incline.  And between the -- Separating the carport from the

13   street there is an approximately eight foot fence in the

14   driveway or gate across the driveway.

15   Q.   Could you see any vehicles inside the carport area?

16   A.   Yes, sir.  I could see a white van was parked behind the

17   fence.

18   Q.   Did you have a clear view of it?

19   A.   No, sir.

20   Q.   Why not?

21   A.   There was a tarp-type material hung over the chain link

22   gate, and I could see the top of the van.

23   Q.   During that time that you were doing surveillance, did

24   you see a red truck parked at the house?

25   A.   Yes, sir, I did.

1    Q.    Where was it parked?

2    A.    It was on the south curb line directly across from the

3    target house that I was observing.

4    Q.    In front of the house or across the street from the

5    house?

6    A.    Across the street.  In front of the house, across the

7    street.

8    Q.    Thank you.

9          Who was it registered to?

10   A.    Daniel Bernadino.

11   Q.    Do you recall what time it arrived?

12   A.    I would say approximately 4:30 or so.  It was late

13   December, and it was just a short time before dark.

14   Q.    Approximately what time did it leave?

15   A.    If I remember correctly, approximately 8:00.

16   Q.    What time did the other -- During the course of the

17   surveillance, did other vehicles leave later that evening?

18   A.    Yes, sir.

19   Q.    Approximately what time?

20   A.    Approximately 11:00 to 11:30 there would have been

21   several vehicles at the residence, and the white van was

22   pulled out from the back of the house with other vehicles.

23   Q.    Please take a look at Government Exhibit No. 66 in the

24   exhibit notebook in front of you.

25   A.    Yes, sir.

1    Q.    Do you have No. 66 in front of you?

2    A.    Yes, sir, I do.

3    Q.    What is it?

4    A.    It is a receipt from Cabela's.

5    Q.    What date was that -- Does it reference ammunition being

6    purchased?

7    A.    Yes, sir, it does.

8    Q.    What date was it purchased?

9    A.    December 17th, 2008.

10   Q.    Did you take that receipt to Cabela's?

11   A.    Yes, sir, I did.

12   Q.    As part of your investigation?

13   A.    Yes, sir.

14   Q.    Were you able to determine what ammunition was purchased

15   at Cabela's?

16   A.    Yes, sir.

17   Q.    And how did you do that?

18   A.    By comparing the SKU number on the receipt for the items

19   on the receipt to the SKU numbers on the shells and the items

20   at Cabela's.

21   Q.    Was it Sellier & Bellot 9 millimeter 150 grain ammunition

22   and Sellier & Bellot .45 caliber 230 grain ammunition?  Is

23   that what was purchased?

24   A.    Yes, sir.  That is correct.

25   Q.    How much had the Defendant purchased of each?

1    A.    It was 350 rounds or seven boxes of .45, 230

2    grain .45 caliber ammunition, and five boxes or 250 rounds of

3    the 9 millimeter ammunition, sir.

4    Q.    Approximately how much does that much ammunition weigh?

5    A.    Approximately 24 pounds, sir.

6    Q.    Were you present on December the 20th, 2008 when the

7    Defendant was stopped near the Mexican border?

8    A.    Yes, I was.

9    Q.    Were you present for a search of the vehicle of Alberto

10   Ortega?

11   A.    Yes, sir.

12   Q.    How many rounds of ammunition were found in that vehicle?

13   A.    Approximately 9,000.

14   Q.    Has that ammunition been in the custody and control of

15   the ATF since that time?

16   A.    Yes, sir, it has.

17   Q.    Did you sort through the ammunition to determine if any

18   ammunition matching the ammunition bought by the Defendant was

19   found in the van?

20   A.    Yes, sir, I did.

21   Q.    And what did you determine?

22   A.    I was able to locate the 350 rounds of Sellier &

23   Bellot .45 caliber 230 grain ammunition and 250 rounds of 115

24   grain 9 millimeter Sellier & Bellot ammunition, which is

25   consistent with the ammunition purchased by the Defendant at

1    Cabela's.

2    Q.    Was this particular ammunition marked in any way?

3    A.    The ammunition when recovered from the van was wrapped in

4    tinfoil and marked with two Xs.

5    Q.    Was all the ammunition marked that way?

6    A.    Yes, sir.

7    Q.    How about --

8           THE COURT:  How was it marked?  I am sorry.  I

9    didn't hear you.

10          THE WITNESS:  The ammunition was wrapped in tinfoil,

11   sir, and on that tinfoil it had masking tape and then two Xs

12   drawn in a black marker.

13   Q.    (BY MR. BURGESS)  And when I say "all the ammunition" I

14   am referring to the 600 rounds.  Were those 600 rounds all

15   marked that way?

16   A.    Oh, yes, sir.

17   Q.    Okay.  Thank you.

18          THE COURT:  Were they wrapped separately, the 350

19   and 250?

20          THE WITNESS:  No, sir.  They were -- Due to the

21   weight of the ammunition I would assume, but they were

22   wrapped -- Each little bundle was approximately the size of a

23   burrito because, you know, that tinfoil wouldn't hold a whole

24   lot of weight in there.

25   Q.    (BY MR. BURGESS)  Please take a look at Government

1    Exhibit No. 62.  It is a photo of a notebook.

2    A.    Yes, sir.

3    Q.    What is that a picture of?

4    A.    That is a picture of the large speaker box that was

5    inside the van which was loaded with tinfoil bundles of

6    ammunition.

7    Q.    Anything relevant to the 600 rounds you were just talking

8    about?

9    A.    Yes, sir.  There are several of the bundles of ammunition

10   marked with the XX, the double X, in that speaker box.

11   Q.    So they had been hidden in the speaker box?

12   A.    Yes, sir.

13   Q.    Let's take a look at Government's Exhibit No. 67 through

14   70.  I believe they are down to your left?

15   A.    Yes, sir.

16   Q.    And please keep them down below the level while you are

17   looking at them.  Take a look at Government Exhibit No. 67

18   first, please.

19   A.    Yes, sir.

20   Q.    What is it?

21   A.    It is a package of 200 rounds of 150 grain 9 millimeter

22   Sellier & Bellot ammunition.

23   Q.    Thank you.  And is that the same ammunition that was

24   seized from the van of Alberto Ortega on December the 20th of

25   2008?

1    A.   Yes, sir, it is.

2         MR. BURGESS:  Your Honor, at this time I move to

3    admit Government Exhibit No. 67.

4         THE COURT:  It is received.

5    Q.   (BY MR. BURGESS)  You can go ahead and place that up on

6    the ledge there.

7    A.   It is also the tinfoil wrapping.

8    Q.   Okay.  It has the wrapping inside that?

9    A.   Yes, sir.  And you can see, maybe not on this one because

10   of the way it is packaged, but the XX on it.

11   Q.   Okay.  Go ahead and take a look at Government Exhibit No.

12   68.

13   A.   Yes, sir.

14   Q.   And you can go ahead and lift it up.  Just keep it below

15   the counter there.  What is that?

16   A.   That is a package of 50 rounds of 115 grain 9 millimeter

17   Sellier & Bellot ammunition.

18   Q.   And was that also seized from the van on December the

19   20th?

20   A.   Yes, sir.

21         MR. BURGESS:  Your Honor, at this time I move to

22   admit Government Exhibit No. 68.

23         THE COURT:  It is received.

24   Q.   (BY MR. BURGESS)  Take a look at Government

25   exhibit -- You can go ahead and lay that on the top, please.

1              THE WITNESS:  This is the package I was referring

2    to, Your Honor.

3    Q.  (BY MR. BURGESS)  That has the XX on it?

4    A.  Yes, sir.

5    Q.  Thank you.

6    A.  About that size.

7    Q.  Please take a look at Government Exhibit No. 69.

8    A.  Yes, sir.

9    Q.  Do you recognize that?

10   A.  Yes, sir.

11   Q.  What is it?

12   A.  It is 150 rounds of 230 grain Sellier &

13   Bellot .45 caliber ammunition.

14   Q.  Also seized on December the 20th?

15   A.  Yes, sir.

16          MR. BURGESS:  Your Honor, move to admit Government's

17   Exhibit No. 69.

18          THE COURT:  It is received.

19   Q.  (BY MR. BURGESS)  And lastly, if you could take a look at

20   Government Exhibit No. 70.

21   A.  Yes, sir.

22   Q.  What is that?

23   A.  That is a package of 200 rounds of 230 grain Sellier &

24   Bellot .45 caliber ammunition.

25   Q.  Seized from the van of Alberto Ortega on December the

1    20th?

2    A.   Yes, sir.

3              MR. BURGESS:  Your Honor, I move to admit Government

4    Exhibit No. 70.

5              THE COURT:  It is received.

6              MR. BURGESS:  Thank you.

7         No further questions.

8              THE COURT:  Does each of these exhibits, 67 through

9    70, also have the material wrapped an those bullets which you

10   found.

11             THE WITNESS:  Yes, sir.  The tinfoil here.  Like I

12   was saying, you were asking about the individual packages.  If

13   I remember correctly, most of these tinfoil packages had

14   approximately 50 rounds or a box of ammunition in them.  And

15   due to space and storage, we consolidated them.  And you can

16   see the tinfoil wrappings.  It should be four tinfoil

17   wrappings in this pack.  There should be four in this one.

18             THE COURT:  In exhibit what?

19             THE WITNESS:  No. 70.

20             THE COURT:  In other words, in each of the exhibits,

21   the tinfoil that was around those bullets is in the bag with

22   the exhibit.

23             THE WITNESS:  Yes, sir.

24             THE COURT:  Okay.

25             MR. BURGESS:  Your Honor, may the witness publish to

1    the jury the photo of No. 62?  Can he hold it up so they can

2    see the photo?

3                THE COURT:  Yes.  You can hold it up.

4                THE WITNESS:  Would you like me to describe it?

5                THE COURT:  They can see it, I think.

6                MR. BURGESS:  Thank you.  I have no further

7    questions at this time, Your Honor.

8                THE COURT:  By the way, the jury will have these

9    exhibits when you are deliberating so you can look at them.

10        Do you have any questions you want to ask?

11                MR. WHITE:  Yes, Your Honor.

12                THE COURT:  Okay.

13                         CROSS EXAMINATION

14   By Mr. White:

15   Q.   How long were you personally there conducting

16   surveillance on 4008 Lisbon on the 19th and 20th of December,

17   2008?

18   A.   From 11:00 at the very beginning until well after dark.

19   I was relieved well after dark.  I would have to guess 8:30

20   maybe, 9:00.

21   Q.   And did you personally see Mr. Bernadino go into 4008

22   Lisbon?

23   A.   No, sir.  I couldn't say that I personally saw

24   Mr. Bernadino.

25   Q.   Earlier you testified that you saw the white van but did

 1    not have a clear view of it.  Did you see anyone messing with

 2    or doing anything to that white van?

 3    A.    No, sir.  Those tarps across the gate obstructed my view.

 4    I could see probably this much of the top of the van, and I

 5    could tell it was a white van parked back there.  I couldn't

 6    see head level down, no, sir.  I wouldn't be able to see

 7    anyone doing anything.

 8    Q.    So you didn't see Mr. Bernadino doing anything to the

 9    white van?

10    A.    No, sir.

11    Q.    With regard to the receipt, I believe it is Government's

12    No. 66 --

13    A.    Yes, sir.

14    Q.    -- from the SKU number, you could only tell what types of

15    ammunition was purchased.  Right?  You can't tell -- Let me

16    ask the question a different way.  You can't tell if the

17    ammunition purchased referenced in this receipt is actually

18    the ammunition in front of you.

19    A.    You are asking me if I know this ammunition here are the

20    exact same ammunition from this receipt?

21    Q.    Yes.

22    A.    No, sir.  I can only testify it is consistent with the

23    same --

24    Q.    Type.

25    A.    -- weight and manufacturer and such.

1   Q.    And you didn't pull any of Mr. Bernadino's DNA or

2   fingerprints off of any of that ammunition.

3            THE COURT:  That is outside the scope.

4   Q.    (BY MR. WHITE)  Altogether there was a total of

5   9,000 -- approximately 9,000 rounds of ammunition found down

6   there near the border.  Did you find -- Other than the 350

7   rounds of .45 caliber ammunition, what other types of

8   ammunition did you find?

9   A.    The 9 millimeter, there was a lot of 7.62 by 39, and off

10  the top of my head now I couldn't say for sure what else was

11  there.

12  Q.    And from Government's No. 66 you were able to ascertain

13  that Mr. Bernadino purchased approximately, if not exactly,

14  350 rounds of .45 caliber ammunition?

15  A.    Yes, sir.  That is what the receipt says.

16  Q.    And you found exactly 350 rounds of .45 caliber

17  ammunition down there at the border?

18  A.    I couldn't tell you the exact total of -- I couldn't

19  honestly tell you the exact total.  I couldn't tell you that

20  we didn't find more.  There may have been more.

21  Q.    But you only brought 350 rounds of .45 caliber ammunition

22  to court today?

23  A.    Yes, sir.

24  Q.    Don't you think it would be fair to bring the

25  other .45 caliber ammunition?

1          THE COURT:  Let's don't make an argument.  Ask him

2     why he brought those particular ones.  Why did you bring these

3     particular ones?

4          THE WITNESS:  Well, Your Honor, because these were

5     all packaged together and similarly, and the fact that we had

6     the 350 rounds of .45 caliber ammunition which was recovered

7     together, packaged similarly, marked similarly, and then we

8     also had right beside that was recovered the 250 rounds of 9

9     millimeter ammunition, which was Sellier & Bellot 115 grain 9

10    millimeter, and this is Sellier & Bellot 230 grain, that led

11    me to believe when I was going through the evidence that this

12    was indeed what belonged with this receipt because of the way

13    it is packaged and recovered in the van.

14    Q.   (BY MR. WHITE)  That is an assumption on your part.

15    Right?

16         THE COURT:  Let's don't argue with him.  He has

17    answered the question.

18    Q.   (BY MR. WHITE)  With regard to Government's No. 62, all

19    those things wrapped up in foil that I believe you described

20    that kind of looks like burritos --

21    A.   Yes, sir.

22    Q.   -- those are all various types of ammunition.

23    A.   Yes, sir.

24    Q.   I see two in Government's No. 62 that has the XX on it.

25    Were there others that had the XX on it?

```
 1    A.    Yes, sir.

 2    Q.    What types of ammunition were wrapped up in the others

 3    that had the XX on it?

 4    A.    At this time, I couldn't tell you if there were any other

 5    bundles of ammo besides this 9 millimeter and this .45 ammo

 6    marked with the XX.   I couldn't tell you what else besides

 7    these right now.

 8    Q.    But there were other things with the XX on them?

 9    A.    I couldn't tell you that, sir.   I couldn't testify to

10    that one way or the other.

11    Q.    I see another one kind of in the middle of Government's

12    No. 62, maybe it starts with a T?

13    A.    Yes, sir.   I believe that is tiere (phonetic), like a

14    round.   Kind of slang for round is what I have been told.

15    Q.    Do you know what type of ammunition was in there?

16    A.    If I ventured a guess on those, it seems my memory serves

17    me that that ammo marked like that was 7.62 by 39.

18    Q.    Do you know who placed all these things in this speaker

19    box in Government's No. 62?

20    A.    No, sir, I do not.

21    Q.    Do you have any reason to believe Mr. Bernadino did?

22    A.    Yes, sir.

23    Q.    How so?

24    A.    He bought the ammunition two days before, and then we

25    recover it in Laredo with him in a vehicle traveling in a
```

1   caravan.

2   Q.   And from all that you conclude he placed it in the

3   speaker box?

4   A.   If I spent 140 bucks on something and then I am traveling

5   with it, I would -- I don't know.

6   Q.   That is a little bit of a stretch, isn't it?

7           THE COURT:  Let's don't argue with the witness.

8           MR. WHITE:  Pass the witness.

9           THE COURT:  Do you have any questions?

10          MR. BURGESS:  I do, Your Honor.

11                  REDIRECT EXAMINATION

12  By Mr. Burgess:

13  Q.   All the ammunition seized, how much of it was made by

14  Sellier & Bellot?

15  A.   I honestly couldn't tell you right now, sir.

16  Q.   Would it refresh your memory to look at a report

17  regarding the ammunition seized from the van?

18  A.   Yes, sir.

19          MR. BURGESS:  Your Honor, may I approach the

20  witness?

21          THE COURT:  Yes.

22  Q.   (BY MR. BURGESS)  I am handing you a report.  If you

23  could review that and determine if that jogs your memory about

24  how many packages were marked with an XX and how many were

25  rounds of Sellier & Bellot ammunition that were found.

```
1    A.   Yes, sir.

2    Q.   It does jog your memory?

3    A.   Yes, sir.

4    Q.   Okay.  How many packages with XX on them were found in

5    the van?

6    A.   I am sorry.  The number of packages was -- I don't

7    believe the report breaks down the number of packages per se.

8    It says here, "Ammunition bearing the name XX" --

9    Q.   I don't want you to read it.

10              MR. WHITE:  I object to reading from the report,

11   Your Honor.

12              THE WITNESS:  I have a total of 600 rounds that were

13   XX.

14   Q.   (BY MR. BURGESS)  There were 600 rounds that were marked

15   XX?

16   A.   Yes, sir.

17   Q.   And how many rounds were from the maker of Sellier &

18   Bellot?

19   A.   Six hundred, sir.

20   Q.   Thank you.

21              MR. BURGESS:  I have no further questions, Your

22   Honor.

23              THE COURT:  Okay.  Can he be excused?

24              MR. BURGESS:  He may, Your Honor, yes.  Thank you.

25              MR. WHITE:  Your Honor, I may like to use this
```

1    witness in my case.

2          THE COURT:  Okay.  You can step down, but you are

3    not excused.  The attorney for the Defendant has indicated he

4    wants to call you as a witness.

5          THE WITNESS:  Yes, sir.

6          MR. BURGESS:  May I retrieve the report from him,

7    Your Honor?

8          THE COURT:  Yes.

9          MR. BURGESS:  Call Special Agent Andre Rivas, Your

10   Honor.

11         THE COURT:  Okay.  You may proceed.

12         MR. BURGESS:  Thank you, Your Honor.

13                         ANDRES RIVAS,

14   Testified on direct examination by Mr. Burgess as follows:

15   Q.   Would you please state your name?

16   A.   Andres Rivas; A-N-D-R-E-S; last name R-I-V-A-S.

17   Q.   And what is your job?

18   A.   I am a special agent with the Bureau of Alcohol, Tobacco,

19   Firearms & Explosives.

20   Q.   And where are you assigned?

21   A.   Laredo, Texas.

22   Q.   And how long have you been there?

23   A.   I have been in Laredo for two years, and before that I

24   was Portland, Oregon for four years.

25   Q.   And if you could perhaps speak a little bit slower, that

1    would be helpful, I think.

2         Do you know a person by the name of Daniel Bernadino?

3    A.   I do, sir.

4    Q.   Is he present in the courtroom?

5    A.   Yes, sir.

6    Q.   Would you please identify him?

7    A.   He is sitting down behind you, sir, wearing glasses.  The

8    one in the middle.

9              MR. BURGESS:  May the record reflect --

10             THE COURT:  Tell me again where he is.

11             THE WITNESS:  He is at the table on the left.  He is

12   the person sitting down in the middle.

13             THE COURT:  Okay.  He has identified the Defendant.

14             MR. BURGESS:  Thank you.

15   Q.   (BY MR. BURGESS)  Turning your attention to December the

16   20th, 2008, were you assisting in the investigation of

17   firearms being smuggled into Mexico?

18   A.   Yes, sir.

19   Q.   Did you conduct an interview of Mr. Bernadino?

20   A.   Yes.

21   Q.   And did you speak to him in Spanish?

22   A.   Yes.

23   Q.   Do you speak Spanish?

24   A.   Yes, sir.

25   Q.   When you first started talking to him, what did he say?

1    A.    He first told us that he was traveling to Mexico with

2    some family and some friends, and that is what he initially

3    told us.

4    Q.    Did he say what his relationship was with the other

5    people in the caravan?

6    A.    He told us that, from what I recall, that he knew one of

7    them, Alberto, for about four to five years.

8    Q.    During the interview did you review the contents of the

9    Defendant's wallet?

10   A.    Yes, sir.

11   Q.    What did you find?

12   A.    One of the things that we found is a receipt for

13   ammunition from a Cabela's store.

14   Q.    Let's take a look at Government Exhibit No. 66 in the

15   notebook in front of you.

16   A.    Okay.

17   Q.    Is that the receipt you found?

18   A.    Yes, sir.

19   Q.    And did you show that receipt to the Defendant?

20   A.    Yes.

21   Q.    And when you did that, what did he say?

22   A.    He said that was the receipt that he -- from the receipt

23   of the firearms.  I mean, sorry.  The ammunition.

24   Q.    Did he have any reaction to being shown the receipt?

25   A.    Throughout the interview the reaction that I recall, from

1  my memory, is that he kind of gave just a relief, big sigh of

2  relief, just like with his shoulders down like it was over;

3  like he had just gotten something off of his shoulders.

4          MR. WHITE:  Objection; speculation, Your Honor.

5          THE COURT:  I think you can describe what you

6  perceived.  I will overrule the objection.  I think he was

7  describing what he perceived.

8          MR. BURGESS:  Thank you.

9  Q.   (BY MR. BURGESS)  Did he explain what the receipt was

10  for?

11  A.   He told me it was for ammunition.

12  Q.   I am sorry.  What?

13  A.   Yes.  He explained that it was for ammunition that he had

14  purchased.

15  Q.   Did he say anything about why he had purchased the

16  ammunition?

17  A.   He had told us that he had purchased this ammunition

18  because Alberto had asked him to buy it for him, and then he

19  turned over the ammunition to Alberto.

20  Q.   Did he say anything about being paid for the ammunition?

21  A.   From what I recall, he mentioned to us that he was going

22  to get paid back the money that it cost him to buy the

23  ammunition; not anything more or less, just the cost of the

24  ammunition.

25  Q.   Did he say what Mr. Ortega did with the ammunition when

1    he gave it to him?

2    A.    I don't remember specifically him telling me that.    I

3    don't recall that.

4    Q.    Did he say if he had any knowledge of the items that were

5    hidden in the van of Mr. Ortega?

6    A.    He mentioned to us that he recalled that about one month

7    before the actual trip, Alberto--he just mentioned

8    Alberto--he, Alberto, were taking firearms to Mexico.

9    Q.    Thank you.

10            MR. BURGESS:    I have no further questions at this

11    time, Your Honor.    I pass the witness.

12            THE COURT:    Do you have any questions of this

13    witness?

14            MR. WHITE:    Yes, Your Honor.

15                        CROSS EXAMINATION

16    By Mr. White:

17    Q.    Altogether you have been with the ATF how long?

18    A.    A little bit more than six years, sir.

19    Q.    And on December the 20th, when did you first get a call

20    or be informed that you might be requested to assist in this

21    investigation?

22    A.    It was early in the morning.    It was -- I believe it was

23    already after the vehicles had been stopped.

24    Q.    So how much time passed from the time you got that call

25    that you might be requested to assist from when you actually

1    began the interview with Mr. Bernadino?

2    A.   I was called not to be on standby, but I was called to

3    report to the office about maybe an hour from the time I got

4    to the call to the time I showed up to the office.

5    Q.   As part of your training as a law enforcement officer,

6    but more specifically as an ATF agent, it is important to

7    document important stuff.  Right?

8    A.   Correct.

9    Q.   Did anybody bring one of those little recorders to the

10   interview, those little tape recorders?

11   A.   A digital recorder?

12   Q.   Any kind of recorder, cassette tape?

13   A.   No.

14   Q.   Video?

15   A.   No, sir.

16   Q.   This is pretty important stuff, and no one thought to --

17            THE COURT:  Let's don't argue with him.

18   Q.   (BY MR. WHITE)  You took some notes with regard to that

19   interview.

20   A.   That is correct.

21   Q.   Did Mr. Bernadino tell you when he turned the ammo over

22   to Mr. Ortega?

23   A.   At the time I believe he did tell me that, but I don't

24   recall exactly when.  But it was -- From the conversation

25   memory that I have, it was shortly after it was purchased that

1    he turned it over.

2    Q.   Did he relate to you anything that he did with the ammo

3    other than turn it over to Mr. Ortega?

4    A.   No.  He just told me that he turned it over.  From what I

5    recall, he just told me he turned it over.

6    Q.   That was it.

7         Was there any discussion between you and Mr. Bernadino

8    concerning why Mr. Ortega asked him to purchase the

9    ammunition?

10   A.   From what I recall, and from reviewing my notes, Mr. -- I

11   know him as Alberto, not as Ortega.  During the interview I

12   always called him Alberto.  Alberto asked him to buy the ammo

13   because he could not buy it at the time, and so he just asked

14   him to buy it and he would pay him for it.

15   Q.   Did Alberto inform Mr. Bernadino that he was going to

16   take it to Mexico?

17   A.   From what I recall from reviewing my notes, he did

18   mention that he knew that Alberto was taking firearms to

19   Mexico.

20   Q.   But that was approximately one month before the trip.

21   Right?

22   A.   That is correct.

23   Q.   But with regard to this particular ammo that was

24   purchased on December the 17th.

25   A.   Right.  I do not recall if he knew that that ammo

1    specifically was going to Mexico.

2    Q.   There is nothing illegal about purchasing ammo for a

3    friend, is there?

4    A.   Well, you cannot be prohibited to purchase ammo.  He's

5    not prohibited, so I would say no.

6              MR. WHITE:  Pass the witness.

7              THE COURT:  Do you have any further questions of

8    this witness?

9              MR. BURGESS:  No, Your Honor.  Thank you.

10             THE COURT:  Can he be excused as a witness?

11             MR. BURGESS:  No, Your Honor.  Not at this time.

12             THE COURT:  Okay.  You can step down, but you are

13   still subject to being called.

14             THE WITNESS:  Thank you, Your Honor.

15             THE COURT:  Call your next witness.

16             MR. BURGESS:  The United States rests, Your Honor.

17             THE COURT:  Okay.  Call your first witness.

18             MR. WHITE:  Your Honor, may we approach very

19   briefly?

20             THE COURT:  Yes.

21             (The following was had outside the hearing of the

22             jury.)

23             MR. WHITE:  I simply would like to make a judgment

24   for acquittal, Your Honor.

25             THE COURT:  Have you made it?  You say you wanted

```
 1    to.  Have you done it?

 2                MR. WHITE:  Yes, Your Honor.  I am making it now.

 3                THE COURT:  And I deny it.

 4                (The following was had in the presence and hearing

 5                of the jury.)

 6                MR. WHITE:  Michael Pontremole.

 7                THE COURT:  How long do you think this witness will

 8    take?

 9                MR. WHITE:  Very brief, Your Honor.

10                THE COURT:  Okay.  Go ahead.

11                        MICHAEL PONTREMOLE,

12    Testified on direct examination by Mr. White as follows:

13    Q.   Mr. Pontremole, where do you live?

14    A.   I live in Fort Worth; the west side of Fort Worth.

15    Q.   How long have you lived there?

16    A.   In Fort Worth or --

17    Q.   Fort Worth in general?

18    A.   Thirty years, forty years.

19    Q.   What type of work do you do?

20    A.   I manage a company called Fort Worth Sash and Door.

21    Q.   Do you know a Mr. Daniel Bernadino?

22    A.   Yes.  Daniel is employed there.

23    Q.   How long have you known him?

24    A.   I have known Daniel probably 20 or 25 years.

25    Q.   Is that how you first came to know him?
```

1  A.   Yes.  We worked at a company called Hobby Door Company on

2  the south side of Fort Worth.

3  Q.   Have you had -- So you have had the opportunity to

4  interact with Mr. Bernadino for 25 or 30 years prior to today?

5  A.   Yes.  Since the mid '80s.

6  Q.   And were the purpose of those interactions work-related

7  or were there other social or other types of interactions?

8  A.   Work-related.

9  Q.   Do you have any opinion as to whether or not

10  Mr. Bernadino is an honest and truthful person?

11  A.   Yeah.  I mean, I would say he is.  You know, presently he

12  does most of our service work, and he is trusted with the

13  vehicles, the equipment --

14          MR. BURGESS:  Your Honor, I would object to going

15  into specific areas.

16          THE COURT:  I think he has answered the question.

17  Q.   (BY MR. WHITE)  Would you believe him under oath?

18  A.   Pardon me?

19  Q.   Would you believe him under oath?

20          MR. BURGESS:  Your Honor, I am going to object to

21  bolstering a witness who hasn't testified.

22          THE COURT:  That is not an appropriate question.

23  Q.   (BY MR. WHITE)  Do you have an opinion as to whether or

24  not Mr. Bernadino is a law-abiding person?

25  A.   Yes, he is, to my knowledge.

```
 1    Q.   Are you acquainted with Mr. Bernadino's reputation in the

 2    community?

 3    A.   Not really.  I mean, I just -- You know, just

 4    work-related.  Most of the guys at work --

 5              THE COURT:  He has answered your question.

 6         You don't need to keep talking.  Once you answer the

 7    question that is all you need to do.

 8              THE WITNESS:  Yes, sir.

 9              THE COURT:  And if they have something else they

10    want to ask you, they will ask you something else.

11    Q.   (BY MR. WHITE)  Are you acquainted with Mr. Bernadino's

12    reputation in you all's work community?

13    A.   No, not really.

14    Q.   I am sorry?

15              THE COURT:  Not really, he said.

16    Q.   (BY MR. WHITE)  Do you work with the same set of people

17    from time to time?

18    A.   The same employees, yes, sir.

19    Q.   And some of the same people that you all do work for?

20    A.   Yes.

21    Q.   Would you consider that to be a community --

22              THE COURT:  Let's don't -- I think you have done

23    enough on this.  He said he is not familiar with his

24    reputation in the community and he is not familiar with his

25    reputation in the work community.  Now, let's move on to
```

1    something else.

2            MR. WHITE:  Pass the witness, Your Honor.

3                    CROSS EXAMINATION

4    By Mr. Burgess:

5    Q.    Sir, when did the Defendant first tell you of his arrest

6    in December of 2008?

7    A.    I probably didn't actually know about it until, you know,

8    we scheduled that hearing that I was at.

9    Q.    In October of 2009?

10   A.    Yeah.

11   Q.    So about a year later?

12   A.    Probably, yes, sir.

13   Q.    Were you present when the Defendant purchased ammunition

14   for Alberto Ortega?

15   A.    When he what?

16   Q.    Purchased ammunition for Alberto Ortega?

17   A.    No.

18           THE COURT:  I think that is outside the scope of the

19   direct.  Let's stay within the scope of the direct.

20           MR. BURGESS:  I have no further questions, Your

21   Honor.

22           THE COURT:  Can he be excused as a witness?

23           MR. WHITE:  Yes, Your Honor.

24           THE COURT:  You can step down.  You are excused as a

25   witness.  Thank you.

1           THE WITNESS:  For the rest of the day?

2           THE COURT:  From now on, until you get called in

3    another case.

4       Call your next witness.

5           MR. WHITE:  I anticipate this might be a lengthy

6    witness, Your Honor.

7           THE COURT:  How long do you think it might be?  Why

8    don't we try and see.

9           MR. WHITE:  Well, it is the Defendant, Your Honor.

10          THE COURT:  That is fine.

11          MR. WHITE:  Call Daniel Bernadino.

12          THE COURT:  How long do you anticipate it to be,

13   just out of curiosity?

14          MR. WHITE:  Fifteen minutes.

15          THE COURT:  Maybe we better take a lunch recess.

16   Let's do take a lunch recess.

17      Mr. Geiger, everybody else go to the jury room and you

18   stay in here so I can ask you a question.

19          (Whereupon, the jury left the courtroom.)

20          THE COURT:  You can be seated, Mr. Geiger.

21      For the information of the attorneys, the court security

22   officer told me a short while ago that Mr. Geiger had

23   indicated to him, I believe, if I got it correct, that you had

24   realized that you knew one of the witnesses.

25          JUROR GEIGER:  Possibly.

74

1           THE COURT:  Possibly.  And which witness was it?

2           JUROR GEIGER:  I guess the lady that is sitting in

3   the black coat.

4           THE COURT:  The lady sitting back here?

5           JUROR GEIGER:  On the front row.  I can't --  There

6   is a gentleman in a jacket with a tie --

7           THE COURT:  You mean somebody that is sitting back

8   in the audience there?

9           JUROR GEIGER:  Yes.

10          THE COURT:  I don't believe those are witnesses?

11          JUROR GEIGER:  Okay.  Well, I didn't know.  I said

12  that might be a family member that I might know.

13          THE COURT:  Well, it might well be a family member?

14          JUROR GEIGER:  Okay.  So that is okay for me to

15  possibly know one of the family members?

16          THE COURT:  Yes.  Nobody asked you whether you knew

17  a family member or not, so I don't see anything wrong with

18  that?

19          JUROR GEIGER:  Okay.  Well, great.

20          THE COURT:  I take it does Defendant see anything

21  wrong with that?

22          MR. WHITE:  We have no objection, Your Honor.

23          THE COURT:  Does the Government see anything wrong

24  with that.

25          MR. BURGESS:  No, Your Honor.

```
 1              THE COURT:  No, there is no problem.  I appreciate
 2    you telling us, but there is no problem?
 3              THE PANEL MEMBER:  Okay.  Thanks.
 4              THE COURT:  So you can go about and join the rest of
 5    them.
 6         Okay.  We are going to take a one-hour lunch -- I didn't
 7    tell the jury how long for the recess.  Tell the jury we are
 8    going to take a one-hour recess, and we will be back at 2:15.
 9    And for the lawyers' benefit, that is what we are getting
10    ready to do.
11                        (Lunch recess.)
12              THE COURT:  Okay.  You may proceed, Mr. White.
13              MR. WHITE:  Call Daniel Bernadino.
14         Your Honor, I don't believe Mr. Bernadino was sworn
15    earlier.
16              THE COURT:  Okay.  Raise your right hand and be
17    sworn.
18              (Whereupon, the oath was administered by the Court.)
19              THE COURT:  Okay.  Come up and be seated.
20         Is there enough room to put a chair in there for
21    Mr. Hernandez?
22              THE INTERPRETER:  Thank you, Your Honor.
23                        DANIEL BERNADINO,
24    Testified on direct examination by Mr. White as follows:
25    Q.   Mr. Bernadino, what is your immigration status?
```

```
 1   A.   Legal resident.

 2   Q.   When did you first come to the United States?

 3   A.   When I was about 14 or 15 years old.

 4   Q.   Since you were so young, who did you come with?

 5   A.   With an uncle.

 6   Q.   How long have you lived here in the Dallas/Fort Worth

 7   area?

 8   A.   Thirty-one years.

 9   Q.   Are you married?

10   A.   Yes.

11   Q.   Who are you married to?

12   A.   Martha Bernadino.

13   Q.   How long have you all been married?

14   A.   Thirty-one years.

15   Q.   Do you have children?

16   A.   Yes.

17   Q.   How old are your children?  How many children?

18   A.   I have four children.

19   Q.   And how old are they?

20   A.   Thirty-one, twenty-nine, nineteen, eight.

21   Q.   And boys?  Girls?

22   A.   Yes.  Two girls and two boys.

23   Q.   What type of work have you done over the years?

24   A.   Carpenter.

25   Q.   Anything else?
```

1    A.    A few other things, like mechanics.

2    Q.    How do you know Alberto Ortega?

3    A.    I don't remember how I met him.

4    Q.    But you all live close to each other?

5    A.    Close.

6    Q.    What is your address?

7    A.    Mine?

8    Q.    Yes, your address?

9    A.    3825 Lisbon, Fort Worth, Texas, 76107.

10   Q.    And Mr. Alberto Ortega lives at 4008 Lisbon.

11   A.    I don't know the number, but he lives about two blocks

12   from my house.

13   Q.    Do you recall purchasing some bullets at Cabela's?

14   A.    Yes.

15   Q.    What were the circumstances?  Why did you come to

16   purchase those bullets?

17   A.    He asked me that favor.

18   Q.    Do you know why?

19   A.    He told me that he is going to be shooting at some place.

20   Q.    Did he tell you where?

21   A.    Some place around Abilene.

22   Q.    Abilene, Texas?

23   A.    Abilene, Texas.  I believe so.

24   Q.    And how did you purchase those bullets?

25   A.    He asked me to buy those bullets.  I didn't have cash

1    with me, so I went and buy using my credit card.

2              THE COURT:  Where was he when you bought the

3    bullets?

4              THE INTERPRETER:  Excuse me, sir?

5              THE COURT:  Where was he when you bought the

6    bullets?

7              THE WITNESS:  I don't know.  Maybe he was at his

8    house.  I was by myself that day.

9    Q.   (BY MR. WHITE)  After you bought the bullets, what did

10   you do with them?

11   A.   I took it to him.

12   Q.   And after you gave the bullets to him, did you ever see

13   those bullets again?

14   A.   No.

15   Q.   Do you recall how much you paid for those bullets?

16   A.   One hundred and something, 130.  I don't recall exactly.

17   Q.   How much was he going to pay you back for purchasing

18   those bullets?

19   A.   The same amount that I paid for them.

20   Q.   Do you recall on the 19th or 20th of December of 2008,

21   taking a trip to Mexico?

22   A.   Yes.

23   Q.   Where were you all headed?

24   A.   They are from Guanajuato, and I was on my way to

25   Michoacan.

```
 1    Q.    To visit your family?

 2    A.    Yes, my father and my mother.

 3    Q.    And what kind of car did you drive that day?

 4    A.    A red Ford.

 5    Q.    And who all was with you?

 6    A.    My brother-in-law, my sister-in-law, my two daughters,

 7    and my wife.

 8    Q.    Your brother-in-law, what's his name?

 9    A.    Luis Chavoya (phonetic).

10    Q.    And how old is he?

11    A.    Sixty, more or less.

12    Q.    I'm sorry?

13    A.    More or less 60.

14    Q.    Sixty?

15    A.    More or less.  I don't know.

16    Q.    I thought he was 70.  Your sister-in-law, about how old

17    is she?

18    A.    About 57, 56.  I don't know.

19    Q.    And your daughters, how old were they?

20    A.    Eight and nineteen.

21    Q.    When you left home, who was driving the red truck?

22    A.    Every one of us.

23    Q.    Who was actually driving?

24    A.    Luis, my brother-in-law.

25    Q.    Let's back up for a minute.  Before you left on the trip
```

1    to Mexico, did you work that day?

2    A.    Yes.

3    Q.    Where do you work at?

4    A.    Fort Worth Sash and Door.

5    Q.    Sash and Door?

6    A.    Yes.

7    Q.    And what time did you get off that day?

8    A.    Normally I finish at 4:30.  I don't know if that day I

9    went out late.  I don't know.

10   Q.    But that was a fairly typical day for you at work?

11   A.    That was the working service, technical services.

12   Q.    What time did you make it home?

13   A.    At what time I arrived?

14   Q.    After work, what time did you make it home after work?

15   A.    Well, it all depends what time I leave from the yard.

16   Q.    Do you recall doing anything special when you got off

17   work that day?

18   A.    No.  I went home that day.

19   Q.    Did you go by Alberto Ortega's home?

20   A.    When we were ready to leave, I went to let him know that

21   we are going to leave.

22   Q.    What was your understanding of whether or not he was

23   taking guns or bullets to Mexico on that trip?

24   A.    I don't understand the question.

25   Q.    Were you aware that he was going to take guns or bullets

1    to Mexico on that trip?

2    A.    No.  He made a commentary before that time, the time

3    before.

4    Q.    How long before did he make that comment?

5    A.    I don't recall.  I never really put attention to what he

6    was saying.  I don't recall the time.

7    Q.    Did you take that comment seriously?

8    A.    Well, I took that more like a commentary of joking.

9    Q.    Do you recall where you all were at when he made that

10    comment?

11    A.    I think we were at his house making -- cooking some meat,

12    if I remember well.

13    Q.    When you all get on the road and head to Mexico that

14    evening, did you all make any stops?

15    A.    Just to put gas.

16    Q.    Your brother-in-law started out driving.  When did you

17    take over driving?

18    A.    The other side of San Antonio.

19    Q.    What was the understanding of why you all were all

20    driving down there together?

21    A.    How is that, several together?

22    Q.    I'm sorry?

23    A.    How is that, several together?

24    Q.    Yes, all three of the vehicles.  What was your

25    understanding?

1    A.    Well, we go together because that's the way if in case of

2    something happens, we have some accident or something.

3    Q.    Is that -- Do you all commonly do that?

4    A.    Yes.

5          THE COURT:   How many times have you gone to Mexico

6    with Mr. Ortega.

7          THE WITNESS:   That was the first time.

8    Q.    (BY MR. WHITE)   But it's a common practice for you and

9    other people, whoever, to drive for safety and for repair

10   purposes together.

11   A.    Yes.   Some years before I make the trip with my brothers,

12   and this time they didn't went.

13   Q.    When you all got close to Laredo, you all got stopped?

14   A.    Yes.

15   Q.    After they took you all from the side of the road, where

16   did they take you?

17   A.    To the station where they inspected from there to here,

18   and the way back they took us over there.

19   Q.    Do you recall being interviewed by the two -- by the

20   agent and the DPS trooper who testified previously?

21   A.    Before?

22   Q.    No.   When you got stopped down there near Laredo.

23   A.    Yes.

24   Q.    How do you feel during the course of this interview?

25   A.    Well, like right now, sad and nervous.

```
 1    Q.   Why were you sad and nervous?

 2    A.   Because my family was outside, and they took us to put us

 3    inside, to lock us up inside.

 4    Q.   Were you nervous because you felt like you had done

 5    something wrong?

 6    A.   No.

 7    Q.   Had you ever been -- Prior to that day, had you ever been

 8    questioned by police or law enforcement officers before?

 9    A.   Never.

10    Q.   What were your thoughts during that interview?

11    A.   I was thinking only of my family.

12    Q.   Do you recall a question about how you became aware that

13    Mr. Ortega was taking guns and bullets to Mexico?

14    A.   If they question me?

15    Q.   Yes.

16    A.   Yes, they questioned me.

17    Q.   Do you recall the exact question that they asked you?

18    A.   No.

19    Q.   Do you recall your thoughts in answering that question?

20    A.   No, I don't recall what I was thinking.

21    Q.   Why did you come back from Mexico?

22    A.   To see my family.

23    Q.   No.  Come back from Mexico.

24    A.   Two weeks later after the vacation of the kids.

25    Q.   So after they questioned you, you went on to Mexico and
```

```
 1   stayed down there with family for two weeks?

 2   A.    Yes.

 3   Q.    And then voluntarily came back.

 4   A.    Yes.

 5   Q.    Mr. Bernadino, have you ever been arrested?

 6   A.    Never.

 7   Q.    Do you consider yourself a law-abiding citizen?

 8   A.    Yes.

 9   Q.    Why do you say that?

10   A.    Because I always do the things in the right way.  I don't

11   do nothing bad and I work all the time.

12   Q.    What knowledge did you have concerning whether or not it

13   was illegal to take bullets and guns to Mexico?

14   A.    I didn't know anything about that.

15             MR. WHITE:  Pass the witness.

16             MR. BURGESS:  May I approach, Your Honor?

17             THE COURT:  Yes.

18             (The following was had outside the hearing of the

19             jury.)

20             MR. BURGESS:  Is the mic off?

21             THE COURT:  Go ahead.

22             MR. BURGESS:  Your Honor, it's my understanding that

23   the Defendant entered the United States illegally and then was

24   given amnesty and that is how he received his green card here.

25   He has testified that he came here legally and he has been
```

1    legal this whole time.

2            THE COURT:  Well, if you want to cross examine him.

3            MR. WHITE:  Your Honor, he didn't testify that he

4    came here legally.  He came here, he testified, when he was 14

5    or 15.

6            THE COURT:  Well, you can clarify that.

7            MR. WHITE:  That would be in violation of 404, Your

8    Honor.  We object.

9            THE COURT:  What would?

10           MR. WHITE:  The information.

11           THE COURT:  Well, you opened the door to that with

12   your questioning.  He is entitled to clarify.

13           (The following was had in the presence and hearing

14           of the jury.)

15           MR. BURGESS:  May I proceed, Your Honor.

16           THE COURT:  Yes, you may proceed.

17           MR. BURGESS:  I think the microphone is off, Your

18   Honor.

19           THE COURT:  Go ahead.

20           MR. BURGESS:  Thank you.

21                        CROSS EXAMINATION

22   By Mr. Burgess:

23   Q.   Sir, when you came to the United States, you did so

24   illegally.  Correct?

25   A.   Yes.

1  Q.   And you received amnesty later to stay in the United

2  States.  Correct?

3  A.   Yes.

4  Q.   You said that you lived close to Mr. Ortega.  Correct?

5  A.   Yes.

6  Q.   Both in the United States and in Mexico you lived close

7  to each other.  Correct?

8        THE COURT:  Let's don't end your questions with a

9  "correct."  Simply ask a question.

10       MR. BURGESS:  Yes, Your Honor.

11 Q.   (BY MR. BURGESS)  Did you and Mr. Ortega live near one

12 another in Mexico?

13 A.   No.

14 Q.   Where did Mr. Ortega live in Mexico?

15 A.   He was living in a different state.  I don't know where.

16 Q.   You said you purchased ammunition at Cabela's for him,

17 didn't you?

18       THE COURT:  Well, don't repeat what he's already

19 said.  If he said that, we just heard it.  So ask him a

20 question that you haven't asked him.

21 Q.   (BY MR. BURGESS)  Did he pay you back for the ammunition

22 you purchased?

23 A.   No.

24 Q.   When was he going to pay you back?

25 A.   The amount that I pay for it.

1    Q.    When was he going to pay you back?

2    A.    When I -- On our return.

3    Q.    Not in Mexico?

4    A.    No.

5    Q.    What day did you take the bullets to Mr. Pulido?

6    A.    I didn't take anything to any Pulido.

7    Q.    I'm sorry.  Ortega.  What day did you take them to Mr.

8    Ortega?

9    A.    I don't recall which day it was.

10   Q.    But you bought the ammunition on December the 17th.

11   Correct?

12   A.    Maybe that was.  I don't remember the date.

13   Q.    You were going to Michoacan?

14   A.    Yes.

15   Q.    That is the home of La Familia Drug Trafficking

16   Organization.

17   A.    I don't know.

18   Q.    You're unfamiliar with La Familia?

19   A.    No.

20   Q.    You were going to Michoacan because you're from

21   Michoacan.  Is that right?

22   A.    I am from the Michoacan state, yes.

23          THE COURT:  You got a double negative.  Do you want

24   to ask the question about La Familia again and ask him in such

25   a way that you don't end up with a double negative?

```
 1   Q.   (BY MR. BURGESS)  Are you familiar with La Familia?

 2   A.   No.

 3   Q.   Mr. Ortega, was he traveling with family?

 4   A.   With his family?

 5   Q.   Yes.

 6   A.   Yes, with his family.

 7   Q.   Did that include an 8 and a 12-year-old son?

 8   A.   I don't know the age.

 9        THE COURT:  Let me clarify something.  Have you ever

10   heard the name La Familia before today?

11        THE WITNESS:  Yes, in the news.

12        THE COURT:  I'm sorry?

13        THE INTERPRETER:  Yes, in the news.

14        THE COURT:  When did you first hear it?

15        THE WITNESS:  I don't recall.  It's in the news.

16   They mentioned that.

17        THE COURT:  Okay.

18        MR. BURGESS:  May I follow up on that, Your Honor?

19        THE COURT:  Yes.

20   Q.   (BY MR. BURGESS)  When you heard the question of La

21   Familia, was the reference that they were from Michoacan?

22   A.   They say that it's from many parts.  I don't know.

23   Q.   Did you typically drive your truck to work?

24   A.   To the work?

25   Q.   Yes.
```

1    A.    Yes.

2    Q.    And on December 19th you were planning on driving to

3    Mexico, driving all night.

4    A.    That's what I say.  My brother-in-law was the one that

5    was driving.

6    Q.    Is it fair to say it was not a typical workday in that

7    you were planning on leaving the country at night?

8    A.    Yes.

9    Q.    So when you talked about what time you normally got off

10    work, this wasn't a normal day, was it?

11            THE INTERPRETER:  I'm sorry.  Would you repeat that?

12    This is the interpreter speaking.

13    Q.    (BY MR. BURGESS)  When you talked about what time you

14    normally got off work, this was not a normal day, was it?

15    A.    I don't have exactly the time to leave the job.

16    Q.    Did you go to the house of Mr. Ortega at any time prior

17    to when you were ready to leave?

18    A.    Yes.

19    Q.    When?

20    A.    Just to -- That day.  Well, in the night.

21    Q.    You did not take your truck to his house during the day?

22    A.    I took a van that I have.

23    Q.    I'm sorry.  I couldn't hear.

24            THE INTERPRETER:  I took a van that I have.

25            MR. BURGESS:  A van, V-A-N?

```
 1                    THE INTERPRETER:  Yes.
 2    Q.   (BY MR. BURGESS)  So did you loan your truck to anyone
 3    that day?
 4    A.   No.  That was at my house.  It was already full.
 5    Q.   When Mr. Ortega told you that he was going to be
 6    smuggling guns to Mexico, you didn't pay attention to that
 7    comment?
 8    A.   No.
 9    Q.   You knew it was illegal to take guns to Mexico.
10    A.   No, I wasn't documented about it.
11    Q.   I'm sorry.  I couldn't hear.
12                    THE INTERPRETER:  I wasn't documented about it.
13    Q.   (BY MR. BURGESS)  How many times have you driven from the
14    United States to Mexico while living here?
15    A.   I don't recall.  Many.
16    Q.   And at the border crossings there are signs that tell you
17    what's illegal to take out of the United States.
18    A.   Oh, yes.  They say don't take guns.
19    Q.   They do say don't take guns?
20    A.   But I don't carry anything, so I didn't put it to
21    attention.
22    Q.   Well, I understand that.  But my question, sir, is
23    whether you know it was against the law to take guns into
24    Mexico?
25    A.   Yes.  But, I mean, at that time, yes.  But since I don't
```

```
 1    carry guns or never take it, so I don't know.

 2    Q.   But when Mr. Ortega told you he was going to do something

 3    that you knew was illegal, you didn't pay attention?

 4    A.   He didn't tell me like that.

 5    Q.   How did he tell you?

 6    A.   He told me that he was thinking, but I didn't pay any

 7    attention.

 8    Q.   How often do you go to his house?

 9    A.   No, I don't know how many times.  But he is not too much

10    at the house because he is driving a trailer.

11    Q.   In an average month, how many times would you go to his

12    house?

13    A.   Sometimes none, sometimes two.  I don't know.

14    Q.   In the weeks leading up to your trip to Mexico, how many

15    times did you go to his house?

16    A.   One or two.

17    Q.   But not on -- I'm sorry.  When you drove to Mexico, you

18    stopped two times.  Were those short stops?

19    A.   I don't recall how many times.  When they put gas, I was

20    laid down on the right side.

21    Q.   When you were questioned by the ATF on December the 20th,

22    did you get nervous when they showed you the receipt?

23    A.   Well, just like now, I was exactly the same.

24    Q.   You did not get more nervous when they showed you the

25    receipt?
```

```
 1   A.    No.  I show it to them.

 2   Q.    When they were finished questioning you, they released

 3   you.  Correct?

 4   A.    Yes.

 5   Q.    You were not arrested.

 6             THE COURT:  I think he just answered that, didn't

 7   he?

 8             MR. BURGESS:  He did, Your Honor.

 9             THE COURT:  Let's don't ask him the same questions

10   twice.

11             MR. BURGESS:  Yes, Your Honor.

12             MR. BURGESS:

13   Q.    Mr. Bernadino, do you have a license to export firearms?

14   A.    No.

15   Q.    Do you have a license to deal firearms?

16   A.    No.

17             MR. BURGESS:  May I have a moment, Your Honor?

18             THE COURT:  Yes.  Let me clarify something while

19   you're doing that.

20        How did you arrange to go with Mr. Ortega to Mexico on

21   the occasion we're talking about?  How did it end up that you

22   all were going together?  When did you make those

23   arrangements?

24             THE WITNESS:  Well, we really -- We were not

25   planning.  I talked to him about three days before that we
```

1    make the trip.

2            THE COURT:  You had talked to Mr. Ortega three days

3    before you made the trip about making the trip?

4            THE WITNESS:  I told Francisco, Poncho, that he

5    lives over there with him, who is going, too, to Mexico.

6            THE COURT:  I'm trying to find out more about how it

7    came about that you and Mr. Ortega were driving down there

8    together.  How did that come about.

9            THE COURT:  Well, I didn't have anybody else to go

10   to Mexico, so I talked to Francisco and asked when they

11   planning to go, because I didn't have nobody else to go to

12   make the trip.

13           THE COURT:  Now, is Francisco Ortega?  Is that the

14   same person?

15           THE WITNESS:  No.  Francisco Orduna that lives

16   together with them.

17           THE COURT:  So you talked to them two or three days

18   before you went on the trip about going to Mexico?

19           THE WITNESS:  Yes, two or three days before.  I

20   don't recall exactly.

21           THE COURT:  And who did you talk to?

22           THE WITNESS:  With Francisco.

23           THE COURT:  And he lives with Mr. Ortega.

24           THE WITNESS:  Yes.  They live together.

25           THE COURT:  And who was driving that van that had

1    the guns in it?

2                THE WITNESS:  Alberto.

3                THE COURT:  Who?

4                THE INTERPRETER:  Alberto.

5                THE COURT:  Alberto.

6                THE WITNESS:  And the white car was driven by

7    Francisco Orduna.

8                THE COURT:  Is Alberto -- What's his last name?

9                THE WITNESS:  Ortega.

10                THE COURT:  Okay.  Go ahead.  I just wanted to get

11    that cleared up.

12                MR. BURGESS:  Thank you, Your Honor.

13    Q.   (BY MR. BURGESS)  You're friends with Mr. Ortega.

14    Correct?

15    A.   Yes.  We know each other.

16    Q.   And what about Alberto Pulido?

17    A.   No, I don't know him.

18    Q.   You were going to be paid for the bullets after the trip

19    to Mexico.  Is that right?

20                THE INTERPRETER:  Excuse me.  Would you repeat that?

21                MR. BURGESS:  Yes.

22    Q.   (BY MR. BURGESS)  Were you going to be paid for the

23    ammunition that you purchased after this trip to Mexico?

24    A.   Yes.  When Alberto come back, he's going to pay me.

25    Q.   Is that because he was going to sell them in Mexico?

```
 1    A.   You said Alberto Pulido.  I don't have nothing to do with
 2    Alberto Pulido.
 3    Q.   But Mr. Ortega, was Mr. Ortega going to sell the
 4    ammunition in Mexico?
 5    A.   He didn't make any commentary about that.
 6    Q.   Did you tell the agents that interviewed you that he told
 7    you he was going to sell it in Mexico?
 8    A.   I don't recall if I ever say that.  They had many
 9    questions.
10    Q.   When you drove in the three-car caravan, was your vehicle
11    always in the lead?
12    A.   It was at the end.
13    Q.   You were at the end?
14    A.   Yes, at the end.  If I remember, I was.
15    Q.   Had you met Sergeant Salinas or Special Agent Rivas
16    before you were interviewed by them?
17    A.   No.
18    Q.   Did they interview you in Spanish?
19    A.   One was able to speak Spanish; the other, no.
20    Q.   When you were initially questioned, you denied any
21    knowledge of the firearms.
22    A.   Yes.  I told them I don't know anything.
23    Q.   When you were confronted with the receipt, did you make
24    the statement, "I'm a bad liar"?
25    A.   No.  I showed them the receipt.
```

```
1   Q.   And did you say that you were a bad liar?

2   A.   No.  I showed it to them.

3   Q.   I'm not arguing that point with you, sir.  I'm asking,

4   did you say, "I'm a bad liar"?

5   A.   Did I say that?

6   Q.   Yes.

7   A.   If I want to, I can lie.

8   Q.   So --

9             THE COURT:  Did you say to one of the people who

10  interviewed you that you were a bad liar?

11            THE WITNESS:  No.  I don't remember ever saying

12  that.  I know that I don't know how to lie.  That's true.

13  Q.   (BY MR. BURGESS)  Did you tell the agents that

14  interviewed you that you suspected that the weapons were in

15  the vehicle?

16  A.   No, I didn't know about that.

17  Q.   I'm sorry?

18            THE INTERPRETER:  I didn't know about that.

19  Q.   (BY MR. BURGESS)  So you did not say that?

20  A.   About my suspicions about that, no.

21  Q.   You were suspicious about that, though?

22  A.   No.

23            MR. BURGESS:  May I have one moment, Your Honor?

24       Just several more questions, Your Honor, if I may.

25  Q.   (BY MR. BURGESS)  Was the reason that Mr. Ortega did not
```

```
 1   pay you for the ammunition at the time you gave it to him was
 2   because he did not yet have money to pay you?
 3   A.   I imagine that.
 4   Q.   But you imagined he would have money once he came back
 5   from Mexico?
 6   A.   Well, what I was thinking that maybe he was needing the
 7   money to make the trip.
 8   Q.   If you ear convicted of these crimes, you could go to
 9   prison.  Is that correct?
10   A.   Yes.
11   Q.   Thank you.
12          MR. BURGESS:  I have no further questions, Your
13   Honor.  Pass the witness.
14          THE COURT:  Do you have any more questions?
15          MR. WHITE:  Yes, Your Honor.
16                    REDIRECT EXAMINATION
17   By Mr. White:
18   Q.   What thought, if any, did you put into whether or not
19   Alberto Ortega was taking guns and ammunitions to Mexico?
20   A.   I didn't think about it.
21   Q.   Why not?
22   A.   Well, it never crossed my mind to think about it.  If I
23   was thinking about that, I never made the trip with him.
24   Q.   Where was Alberto Ortega going to get the money to pay
25   you back for the bullets that you purchased?
```

1          THE COURT:  Let me follow up on that.

2      Why would you not have made the trip, then, if you

3  thought he was taking guns to Mexico?

4          THE WITNESS:  If I see the guns or if I knew that

5  he's going to take some guns, I don't make the trip.

6          THE COURT:  Why would you not have made the trip?

7          THE WITNESS:  Because if I see the guns.  They're in

8  front.

9          THE COURT:  Why would you not have made the trip?

10         THE WITNESS:  Because if you see a whole bunch of

11  guns like that, it's very dedicated to see them.  I don't know

12  what level of what that thing was at.

13         THE COURT:  I'm trying to understand why would you

14  not want to make a trip with him if you knew he was taking

15  guns to Mexico.

16         THE WITNESS:  Well, because when they stop us they

17  told me what was a crime, and they explained to me about that,

18  what was a crime.

19         THE COURT:  Who told you that?

20         THE WITNESS:  When they stopped me, they say that

21  was a crime.

22         THE COURT:  I'm trying to find out why you wouldn't

23  have made the trip with him if you had known he was taking

24  guns to Mexico.

25         THE WITNESS:  At that time, even if I knew

1  something, I make the trip one way or another.

2          THE COURT:  Are you unable to tell me why you would

3  not have made the trip if you had known that he was taking

4  guns to Mexico?

5          THE WITNESS:  I don't understand the question.

6          THE COURT:  Okay.  I give up.

7      If you want to ask him some questions, go ahead.

8  Q.  (BY MR. WHITE)  Where was Alberto Ortega going to get the

9  money to pay you back for the bullets?

10 A.  He told me that he's going to shoot them in Abilene.

11 Q.  I'm sorry.  I didn't understand.

12         THE INTERPRETER:  He told me that he's going to

13 shoot them in Abilene.

14 Q.  (BY MR. WHITE)  No.  The question was -- He was going to

15 pay you back for the bullets that you had put on your credit

16 card.

17 A.  Yes.

18 Q.  What was your understanding, if any, as to where he was

19 going to get the money to pay you back?

20 A.  Well, with the income tax after they arrive.

21 Q.  Do you make it a practice to hang out with folks that

22 carry a whole bunch of guns?

23 A.  No.

24 Q.  Not something you would have your family around either,

25 would it?

```
 1    A.    No.

 2              MR. WHITE:  Pass the witness.

 3              THE COURT:  Okay.  Do you have any other questions

 4    of this witness?

 5              MR. BURGESS:  No, Your Honor.  Thank you.

 6              THE COURT:  Okay.  You can step down.

 7         Call your next witness.

 8              MR. WHITE:  Benjamin Martinez, Your Honor.

 9              THE COURT:  You may proceed.

10                   BENJAMIN MARTINEZ,

11    Testified on direct examination by Mr. White as follows:

12    Q.    Mr. Martinez, where do you live?

13    A.    4828 Tallman in Fort Worth.

14    Q.    How long have you lived there?

15    A.    About 16 years ago.

16    Q.    How long have you lived here in the Dallas/Fort Worth

17    area?

18    A.    Oh, about 30 years, maybe.

19    Q.    You are a United States citizen.  Correct?

20    A.    Yes, sir.

21    Q.    What do you do for a living?

22    A.    Paint.

23    Q.    How long have you been a painter?

24    A.    When I got -- 14 or 15 years ago.  I mean, when I got 15

25    years old.
```

```
 1   Q.    How old are you now?

 2   A.    Fifty-eight.

 3   Q.    Do you know Mr. Bernadino?

 4   A.    Yes, sir.

 5   Q.    How did you come to know Mr. Bernadino?

 6   A.    Well, he is a carpenter and I was a painter, and we work

 7   together sometimes.

 8   Q.    How long have you known him?

 9   A.    About eight years ago.

10   Q.    So you've had the opportunity to interact with Mr.

11   Bernadino prior to today?

12   A.    Yes what were the purposes of those interactions?

13         THE COURT:  What did you all do together.

14         THE WITNESS:  He do the trimming and I do the

15   painting.  Well, we socialize, we get together, and we were

16   kind of workers, honest workers, and we socialize together.

17   Q.    (BY MR. WHITE)  Work-related and outside of work you all

18   socialize?

19   A.    Yes.

20   Q.    And how often would you interact with Mr. Bernadino?

21   A.    Oh, when I got something to do, a week sometimes

22   weekends, but, you know, we stay together.

23   Q.    Do you have an opinion as to whether or not Mr. Bernadino

24   is an honest and truthful person?

25   A.    Yes, sir.
```

1    Q.    And what is that opinion?

2    A.    He is an honest worker, social, honest.

3    Q.    Do you have an opinion as to whether Mr. Bernadino is a

4    law-abiding person?

5    A.    Yes, sir.

6    Q.    And what is your opinion?

7    A.    He's a good people, good person.

8    Q.    Do you know if Mr. Bernadino has a reputation in the

9    community for being a truthful and honest person?

10   A.    Yes, sir.

11   Q.    Are you acquainted with that reputation?

12   A.    Yes, sir.

13   Q.    What is your understanding of that reputation for being a

14   truthful and honest person?

15   A.    Through the friendship that we share.

16   Q.    And what is that reputation?

17   A.    He is an honorable person, respectable, social.

18   Q.    What is his reputation with regard -- in the community

19   with regard to being a law-abiding person?

20   A.    He is a responsible people.

21          MR. WHITE:  Pass the witness.

22          THE COURT:  Do you have any questions of this

23   witness?

24          MR. BURGESS:  Yes, Your Honor.  Thank you.

25                  CROSS EXAMINATION

1    By Mr. Burgess:

2    Q.   Mr. Martinez, where are you from in Mexico?

3    A.   I am born in Salisco, (phonetic) and I lived in

4    Monterrey, Monteleon.

5    Q.   All right.  Have you heard of La Familia?

6    A.   My family?

7         MR. WHITE:  It's outside the scope of the direct,

8    Your Honor.

9         THE COURT:  That is outside the scope of direct.  I

10   agree.

11        MR. BURGESS:  Thank you, Your Honor.

12   Q.   (BY MR. BURGESS)  When did the Defendant first tell you

13   about being stopped in December of 2008?

14   A.   He never told me anything about it.

15        MR. BURGESS:  Thank you.  I have no further

16   questions, Your Honor.

17        MR. WHITE:  Can this witness be excused?

18        MR. WHITE:  Yes, Your Honor.

19        THE COURT:  You can step down.  You are excused.

20   Thank you.

21        Call your next witness.

22        MR. WHITE:  Your Honor, may we approach?

23        THE COURT:  Yes, if you would like.

24        (The following was had outside the hearing of the

25        jury.)

1              THE COURT:  Okay.  Go ahead.

2              MR. WHITE:  Your Honor, the Defense is aware of the

3    Court's general procedure in allowing only two character

4    witnesses.

5              THE COURT:  Good.  I'm glad you knew that.

6              MR. WHITE:  However, because of the specifics of

7    this case, we request the Court to make an exception and allow

8    us to call additional character witnesses.

9              THE COURT:  How many did you have in mind?

10             MR. WHITE:  I have two more.

11             THE COURT:  No.  We're not going to do that.  Who

12   are they?

13             MR. WHITE:  His wife.

14             THE COURT:  I assumed you would call your best ones

15   first since you knew that two was my limit.

16             MR. WHITE:  Yes, Your Honor.

17             THE COURT:  Okay.  I don't think I'm going to make

18   an exception to my rule here.

19             MR. WHITE:  I just wanted to make a request.

20             MR. BURGESS:  I have one rebuttal witness, Your

21   Honor.

22             (The following was had in the presence and hearing

23             of the jury.)

24             MR. WHITE:  The Defense rests, Your Honor.

25             THE COURT:  Okay.  Does the Government have any

1    rebuttal witnesses?

2           MR. BURGESS:  Yes, Your Honor.  Special Agent Rivas.

3           THE COURT:  Okay.  You may proceed.  .

4           MR. BURGESS:  Thank you, Your Honor.

5                         <u>ANDRES RIVAS</u>,

6    Testified on direct examination by Mr. Burgess as follows:

7    Q.    Are you the same Andres Rivas who testified earlier?

8    A.    Yes, sir.

9    Q.    I remind you, sir, you are still under oath.

10   A.    Yes, sir.

11   Q.    During your interview of the Defendant when he was shown

12   the receipt from his wallet, did he make any comments in

13   reference to why?

14   A.    Yes.

15   Q.    What did he say?

16   A.    Sometime after the receipt came up, the conversation

17   about the ammunition, I was referring to earlier today that he

18   just kind of like a relief expression, and that he is not a

19   good liar is basically what I recall him saying is he is not a

20   good liar.

21   Q.    Thank you.

22          MR. BURGESS:  I have no further questions, Your

23   Honor.

24          THE COURT:  Do you have any questions you want to

25   ask?

1          MR. WHITE:  Yes, Your Honor.

2                    CROSS EXAMINATION

3    By Mr. White:

4    Q.    Why would you leave that out of your direct testimony

5    earlier?

6    A.    I wasn't asked that, sir.

7    Q.    As part of your training, we talked about that it is

8    important to document important stuff.  Right?

9    A.    Right.

10   Q.    You created some notes with regard to your interview of

11   Mr. Bernadino, didn't you?

12   A.    Yes, sir.

13   Q.    Do you recall putting that in your notes?

14   A.    No, sir.  No, I did not put that in my notes.

15   Q.    You just thought you would surprise us with it, huh?

16          MR. BURGESS:  Objection, Your Honor.

17          MR. WHITE:  Pass the witness.

18          THE COURT:  Do you have any more questions?

19          MR. BURGESS:  No, Your Honor.  And we would excuse

20   this witness at this time.

21          THE COURT:  Okay.  You are excused.

22          THE WITNESS:  Thank you, sir.

23          THE COURT:  Okay.  Does the Government have any

24   further evidence?

25          MR. BURGESS:  No, Your Honor.  The United States

```
 1    rests.

 2              THE COURT:  Does the Government close?

 3              MR. BURGESS:  Yes, Your Honor.  We close.

 4              THE COURT:  And the Defendant closes?

 5              MR. WHITE:  Yes, Your Honor.

 6              THE COURT:  Okay.  Let me have the attorneys come up

 7    here a minute.

 8              (The following was had outside the hearing of the

 9              jury.)

10              THE COURT:  Can you do it in seven minutes?

11              MR. BURGESS:  Can I have ten?

12              THE COURT:  You think you need ten.

13              MR. BURGESS:  I would like to have the cushion so I

14    don't have to talk quickly.

15              THE COURT:  How long do you want the opening for?

16              MR. BURGESS:  If I could have six minutes for

17    opening and four for rebuttal.

18              THE COURT:  Do you want me to warn you after you

19    have used six?

20              MR. BURGESS:  Please, Your Honor, yes.

21              THE COURT:  And do you want me to warn you after you

22    have used some amount?

23              MR. BURGESS:  If you could warn me when I have one

24    minute left, I would appreciate that.

25              THE COURT:  This is your very first part.
```

108

1           MR. BURGESS:  No, during the first time the

2   six-minute warning will be sufficient.

3           THE COURT:  At six?

4           MR. BURGESS:  Yes, sir.

5           THE COURT:  And at the end do you want me to warn

6   you when you have one left?

7           MR. BURGESS:  Yes, Your Honor.

8   Q.   You don't need that much, do you?

9           MR. WHITE:  Your Honor, yes, we do.

10          THE COURT:  Okay.

11          MR. BURGESS:  Your Honor, may we excuse the

12  remaining witnesses?  Some of them wanted to come in and watch

13  argument.

14          THE COURT:  Yes.  All the witnesses are excused.

15          MR. BURGESS:  Thank you.

16          THE COURT:  Okay.  What kind of warning do you want?

17          MR. WHITE:  Two-minute warning, Your Honor.

18          THE COURT:  Warning after eight.  Okay.  You all can

19  go back.

20      Oh, let me say one thing.  I think we need to have the

21  record reflect when Francisco Hernandez, Sr. took over the

22  interpreting.  I don't think the record reflects that.  And my

23  recollection is that it was following our first recess and

24  that was the recess that we took while you all were making

25  your challenges.

```
 1              MR. BURGESS:  I don't remember, Your Honor.  I'll be

 2    honest.

 3              MR. WHITE:  I am not for certain.  I think so.

 4              THE COURT:  Well, I'm going to say that is my

 5    memory.  I think the record ought to reflect that he has been

 6    interpreting at all times since then, and his son left at that

 7    time.

 8              MR. WHITE:  Yes, sir.

 9              (The following was had in the presence and hearing

10              of the jury.)

11              THE COURT:  Okay.  The evidence is concluded, and

12    I'm giving the lawyers ten minutes each to make a final

13    statement.  And the Government will start first and then the

14    lawyer for the Defendant will make a statement, and then the

15    Government will have a very short period of time to respond to

16    that.  And then once that happens, then I will give you the

17    legal instructions.

18         Okay.  You may proceed.

19              MR. BURGESS:  Thank you, Your Honor.

20         (End of requested testimony.)

21

22

23

24

25
```

1        I certify that the foregoing is a true correct

2   transcript, to the best of my ability, of the above pages, of

3   the stenographic notes provided to me by the Fort Worth

4   Division of Northern District of Texas, of the proceedings

5   taken on he date and time previously stated in the above

6   matter.

7        I further certify that I am neither counsel for, related

8   to, nor employed by any of the parties to the action in which

9   this hearing was taken, and further that I am not financially

10  nor otherwise interested in the outcome of the action.

11

12                    S/Shawn McRoberts              12/15/2010

13                    _____DATE_____
                      SHAWN McROBERTS, RMR, CRR
14                    FEDERAL OFFICIAL COURT REPORTER

15

16

17

18

19

20

21

22

23

24

25